**TEMPEST BROADCASTING CORPORATION,**
**Appellant,**

v.

**Christopher D. IMLAY and Booth, Freret, Imlay & Tepper, P.C., Appellees.**

**No. 14–04–00080–CV.**

Court of Appeals of Texas,
Houston (14th Dist.).

Nov. 18, 2004.

Tracy J. Willi, Houston, for Appellant.

Ann Tomino LeBlanc, Houston, and Terry Fitzgerald, Woodlands, for Appellees.

Panel consists of Justice EDELMAN, Justice GUZMAN, and Judge RAY.*

## OPINION

ELIZABETH RAY, Judge (Assigned).

In this interlocutory appeal, we are asked to consider whether the trial court erred in granting the special appearance of an out-of-state lawyer and law firm whose contacts with Texas have been limited to the performance of legal representation on behalf of their Texas client in negotiations with a Texas company to purchase a Texas radio station. For the reasons detailed below, we reverse and remand.

## FACTUAL and PROCEDURAL BACKGROUND

**1. A Texas Seller Begins Negotiations with a Texas Buyer.**

At the center of this dispute is an AM radio station located in Robstown, Texas, and a Federal Communication Commission (FCC) broadcasting license. Appellant Tempest Broadcasting Corporation ("Tempest"), a Texas corporation with its principal place of business in Harris County, Texas, once owned the physical radio station and also held the FCC license. In 1998, Tempest sold the station and assigned the license to another Texas entity, The Worship Center of Kingsville ("WCK"), and provided financing to WCK (while retaining a security interest). After a few years, WCK became delinquent on its payments and Tempest and WCK began to discuss possible options.

B Communications ("B"), also a Texas entity, approached Tempest and WCK to discuss purchasing the radio station and obtaining an assignment of the FCC license. To assist in the negotiations, B hired attorney Christopher Imlay and his firm, Booth, Freret, Imlay & Tepper, P.C. (the "law firm"). Imlay, president of the law firm and a resident of Maryland, practices solely in the area of communications law before the FCC.

**2. Imlay and the law firm conduct negotiations with Tempest for the radio station and broadcasting license.**

Imlay first communicated with Tempest's owner, David Showalter, on September 14, 2001, by telephone. At that time, according to Showalter, Imlay advised that the sale should go through a "two-step" process—the land first and then the license. On September 25, 2001, Imlay forwarded to Showalter two proposed documents, both of which were drafted by the law firm. The first was an asset purchase agreement for the purchase and sale of the station and land in Robstown, Texas, for $32,000, and the second was a separate

---

* The Honorable Elizabeth Ray, Judge of the 165th District Court of Harris County, sitting by assignment pursuant to TEX. GOV'T CODE § 74.003(h).

license assignment agreement conveying the FCC license to B for $200,000. B, Tempest, and WCK were all listed as parties to these proposed agreements.

On at least two occasions during the negotiations in 2001 and 2002, Imlay represented in writing to Showalter that he would start the FCC application for approval of the license assignment after the agreements were signed. Drafts of the two agreements and proposed revisions were exchanged between Tempest and Imlay.

**3. Imlay and the law firm negotiated a separate agreement of the FCC license from WCK to B without informing Tempest.**

In October 2000, apparently unbeknownst to Tempest, B and WCK entered into a separate agreement in which WCK agreed to assign the FCC license to B for $10,000. Imlay obtained FCC approval for the assignment on behalf of B. The assignment of the license was consummated on January 4, 2002. On January 10, 2002, Imlay notified Tempest by fax that "all of the necessary arrangements for the assignment of the FCC license from The Worship Center of Kingsville are in place." Showalter responded by fax to Imlay the next day, claiming that Tempest had relied on Imlay's representations that the parties' complete agreement (physical plant AND license) was "a done deal" and that, in reliance on those representations, Tempest had refrained from taking action to protect its interest in the property and the license. Tempest, WCK and B eventually executed an asset purchase agreement in which B agreed to pay Tempest $225,000 for the land and physical property of the radio station (not including the license), but the closing provided for in the agreement never occurred. The parties dispute the reasons why that closing never occurred.

**4. Tempest sues B, Imlay, and the law firm, and the trial court grants the defendants' special appearance.**

In the spring of 2003, Tempest sued B, Imlay, and the law firm, alleging breach of contract, tortious interference with contract, fraud, and hindering a secured creditor. Tempest's primary complaint was that the defendants, without Tempest's knowledge or permission, obtained the FCC license—the most valuable asset—for $10,000 while representing to Tempest that they intended to complete the purchase of the license and the station property for $232,000. According to Tempest, once the defendants possessed the FCC license, they had no need for the station, which had little value apart from the license.

In response, Imlay and the law firm filed a special appearance supported by Imlay's affidavit. In the affidavit, Imlay asserted generally that neither he nor any other attorney in the law firm practiced law in Texas; neither he nor the law firm owned property, maintained an office or bank accounts, or paid taxes in Texas; neither he nor anyone in the law firm ever traveled to Texas to meet with any party to this litigation; and neither he nor the law firm has ever purposefully directed any action toward residents or businesses in Texas. A day before the hearing on the special appearance, Tempest amended its petition to add allegations of conspiracy to defraud against all defendants and additional facts to support personal jurisdiction over Imlay and the law firm. At a hearing on the special appearance, Showalter testified regarding his communications with Imlay and the law firm and submitted supporting exhibits.

On motion by Imlay and the law firm, the trial court permitted them to submit a reply post hearing, and when they did so,

they included an additional affidavit by Imlay in which he responded more specifically to the misrepresentations and other conduct alleged by Tempest. The trial court delayed its ruling until after Imlay's second affidavit was filed post-hearing, but then granted the special appearance and dismissed Tempest's claims against Imlay and the law firm. Although Tempest requested findings of fact and conclusions of law and renewed its request in a notice of past due findings of fact and conclusions of law, the trial court was not required to and did not file them. This interlocutory appeal followed.

## ANALYSIS

### I. The Procedural Arguments

Before we reach the substantive arguments, we must address two of Tempest's arguments concerning the standard and scope of our review. First, Tempest argues that we should apply a less deferential standard of review to implied findings of fact, because the trial court failed to issue findings of fact and conclusions of law after Tempest properly requested them. Tempest believes this would encourage trial courts to comply with proper requests in interlocutory appeals. Second, Tempest contends that our review of the evidence should not include Imlay's second affidavit, which was attached to appellees' reply in support of their special appearance and filed post-hearing, because Texas Rule of Civil Procedure 120a requires that affidavits shall be served at least seven days before the hearing on the special appearance. We disagree with Tempest's first argument and agree with the second. Accordingly, we hold that the trial court erred in granting appellees' special appearance.

### A. Is Tempest Entitled to a Lowered Standard of Review Because the Trial Court Did Not File Findings of Fact and Conclusions of Law?

■ Tempest argues that, instead of applying a legal and factual sufficiency review to the implied fact findings, we should review them de novo. Tempest's theory is that, because the trial court did not file findings of fact and conclusions of law, after being properly requested, we should apply a less deferential standard of review to the trial court's implied fact findings. We disagree.

■ In reviewing a trial court's ruling on a special appearance, the plaintiff has the initial burden of pleading allegations sufficient to bring the nonresident defendant within the provisions of the Texas long-arm statute. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 793 (Tex.2002); *Ring Power Sys. v. Int'l De Comercio Y Consultoria, S.A.*, 39 S.W.3d 350, 352 (Tex.App.-Houston [14th Dist.] 2001, no pet.). At the special appearance hearing, however, the nonresident challenging the court's assertion of personal jurisdiction must negate all jurisdictional bases. *BMC Software*, 83 S.W.3d at 793; *Ring Power Sys.*, 39 S.W.3d at 352.

■ Whether a court has personal jurisdiction over a defendant is a question of law, which we review de novo. *BMC Software*, 83 S.W.3d at 794. However, the trial court is often called upon to resolve factual issues before deciding the jurisdiction question. *Id.; C-Loc Retention Sys., Inc. v. Hendrix*, 993 S.W.2d 473, 476 (Tex.App.-Houston [14th Dist.] 1999, no pet.). When, as here, the trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied. *BMC Software*, 83 S.W.3d at 795. In that situation, when the appellate record includes both the reporter's and clerk's rec-

ords, however, these implied findings are not conclusive and may be challenged for legal and factual sufficiency. *Id.* In reviewing a legal sufficiency challenge, the no-evidence challenge fails if there is more than a scintilla of evidence to support the finding. *Id.* In reviewing a factual sufficiency challenge, we set aside the trial court's decision only if its ruling is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

Tempest acknowledges that Texas Rule of Appellate Procedure 28.1 expressly provides that the trial court "need not, but may ... file findings of fact and conclusions of law" relating to an appealable interlocutory order. *See* Tex.R.App. P. 28.1. Nevertheless, it argues that when a party properly requests findings of fact and conclusions of law and preserves the issue for appeal, it should not be subjected to a "harsher" standard of review because the trial court declines to file them. Tempest argues that the standard of review for implied findings should be de novo because, by applying this less deferential standard of review, trial courts will be encouraged to issue findings of fact and conclusions of law when properly requested. Otherwise, they will have no incentive to ever file them in an interlocutory appeal.

Tempest's argument fails to encompass the concept that a trial court might voluntarily file findings and conclusions to assist the appellate courts, an occurrence neither unique nor unusual. Indeed, this argument smacks of the notion that trial judges need an incentive to voluntarily clarify their legal reasoning. Typically the record makes the judge's thoughts crystal clear, as was the case here. Tempest's argument also ignores Rule 28.1, which states that a trial court may—but is not required to—file findings of fact and conclusions of law. *See Smith Barney Shearson, Inc. v. Finstad,* 888 S.W.2d 111, 114 (Tex.App.-Houston [1st Dist.] 1994, no writ). Moreover, Tempest does not explain why reviewing implied fact findings under a legal and factual sufficiency review is unduly harsh, and it does not provide us any authorities that support applying a de novo review of implied fact findings in this circumstance.[1] Therefore, we are not persuaded that we should encourage trial courts to do something that, under the rules, they are expressly not required to do.

Accordingly, we will review any implied findings of fact for legal and factual sufficiency. *See BMC Software,* 83 S.W.3d at

---

1. In support of its argument, Tempest cites two cases, but neither case supports applying a de novo standard of review to fact findings, implied or otherwise, in a special appearance. In *Zamarron v. Shinko Wire Co., Ltd,* this court merely determined that any complaint the appellant had about the trial court's failure to file findings of fact and conclusions of law after it granted a special appearance was waived because the appellant failed to file a notice of past due findings of fact and conclusions of law. *See* 125 S.W.3d 132, 137 n. 3 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). The *Zamarron* court gave no indication of the nature of the appellant's complaint and did not discuss applying an alternative standard of review. *See id.* Tempest also cites *Gen. Electric. Co. v. Brown & Ross International Distributors, Inc.,* for the proposition that the appellate court reviews all the evidence properly presented to the trial court in a special appearance. *See* 804 S.W.2d 527, 534 (Tex.App.-Houston [1st Dist.] 1990, writ denied). We do not disagree with that statement. However, in that case, the defendants, whose special appearance was reversed and remanded, argued in a motion for rehearing that the court of appeals *erroneously* applied a de novo standard of review to the evidence, and in response, the court simply stated that, in a special appearance, it was appropriate to review all the evidence in the record. *See id.*

795; *In re King's Estate*, 244 S.W.2d at 661.

## B. Should We Consider Imlay's Second Affidavit Attached in Support of Appellees' Reply, When the Affidavit Was Not Served at Least Seven Days Before the Special Appearance Hearing as Required in Rule 120a?

■ Tempest also raises an issue concerning the scope of our review. At the special appearance hearing, Tempest presented testimony from Showalter and introduced a number of exhibits in support of jurisdiction. Imlay and the law firm presented no additional evidence, instead relying on Imlay's previously-filed affidavit. Toward the end of the hearing, the following exchange took place as Tempest's counsel, Ms. Willi, made her final argument:

> Ms. Willi: . . . We have specific jurisdiction under all of the facts that we have stated today and as well as in the discovery responses, we have grounds to support even general jurisdiction because he has regular contacts with Texas. He represents—he states in his interrogatories that he represents entities all over Texas in their endeavors to buy radio stations located here in Texas and he has represented particularly the B Communications clients since at least 1993 on many Texas transactions.

> Ms. LeBlanc: Your Honor, just one caveat to that. If I could reply to that, Your Honor, is that Mr. Imlay has never actually met B Communications here in Texas. He was retained while attending a seminar in Oklahoma pertaining to the FCC. So, he's never met with anyone on this transaction here in Texas.

> The Court: Give me a reply as soon as you can.

> Ms. LeBlanc: Yes, Your Honor.

Thereafter, Imlay and the law firm filed a reply, but they attached to the reply a second, more detailed affidavit by Imlay. In the second affidavit, which is three pages long and contains seventeen substantive paragraphs, Imlay sets out numerous factual allegations (none of which were raised at the hearing) to support his position that jurisdiction should not attach.

Tempest filed objections to the second affidavit, arguing that, among other things, it was untimely because, under Texas Rule of Civil Procedure 120a(3), any affidavits "shall be served at least seven days before the hearing" on the special appearance. *See* TEX.R. CIV. P. 120a(3). Appellees assert that their late-filed response was acceptable because it is within the trial judge's discretion to allow movants an opportunity to reply, and the trial court's request for a reply from the movants implicitly permitted the late filing of the affidavit. Appellees reason that, since Tempest did not file its response to the special appearance and its first amended petition containing the additional jurisdictional allegations until the day before the hearing, they should be allowed to file their controverting proof after the hearing. Appellees conclude with the argument that Tempest waived its objection to the later-filed affidavit because it failed to secure a ruling as required by Texas Rule of Appellate Procedure 33.1.[2]

The language of Rule 120a is specific that any affidavits "shall be served at least seven days before the hearing." *See* TEX.R. CIV. P. 120a(3). Imlay and the law firm did not file their second affidavit until after the hearing. The rule provides that, when it appears from the affidavits of a

**2.** This argument was made for the first time at the oral argument of this case.

party *opposing* the special appearance that he is unable to present by "facts essential to justify his opposition," the trial judge may "order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or *may make such other order as is just.*" *See id.* (emphasis added); *see also Potkovick v. Reg'l Ventures, Inc.,* 904 S.W.2d 846, 850 (Tex. App.-Eastland 1995, no writ) (holding that trial court does have some discretion under Rule 120a to enter other orders as are "just"). This part of the rule appears to permit the judge some discretion to order a continuance or other relief, but only in response to the affidavit of a party opposing the special appearance who claims he cannot adequately prepare for the special appearance hearing. Here, because appellees are the movants in the special appearance motion (as opposed to being the opposing party), this part of the rule does not apply to them. Additionally, since appellees did not demonstrate by affidavit that they needed a continuance of the hearing to "present facts essential to justify [their] opposition," we find no basis in the rule to support the contention that the late-filed affidavit must be considered by the trial judge.

Now we must consider appellees' contention that Tempest waived its objection to Imlay's second affidavit because it did not obtain a ruling from the trial court. *See* Tex.R.App. P. 33.1(a). The record does not support the argument that the court intended to permit appellees carte blanche rights to provide additional evidence (via affidavit). Since the late-filed affidavit was not properly before the trial court pursuant to 120a, it makes no sense to penalize Tempest for failing to obtain a ruling from the trial court on its objection to the very filing of which it complains. Had appellees requested leave of court to re-open the evidence in a subsequent hearing to add the tardy affidavit, Tempest at least would

have been given the right to present controverting evidence and cross-examine. As it is, appellees have gotten in the last word while Tempest was silenced by section 120a.

Nor are we persuaded by appellees' argument that they did not know of Tempest's specific allegations until shortly before the hearing. Imlay and the law firm were the movants and had the burden to demonstrate they were not amenable to jurisdiction in Texas. They were also aware of the basis for Tempest's claims, which was apparent from its original petition. Permitting movants to submit post-hearing affidavits in such a situation encourages them to withhold evidence until after the hearing, potentially providing an unfair advantage to the movant and extending the entire process in a manner not contemplated by Rule 120a.

Therefore, we hold that Imlay's second affidavit was not properly before the trial court and should not be considered.

## II. The Long-arm Statute and Federal Due Process Requirements

We turn now to the substance of the appeal. Tempest contends that Imlay and the law firm satisfy the requirements of the Texas long-arm statute because they conducted business in Texas and committed torts in Texas. Tempest also argues that subjecting Imlay and the law firm to the jurisdiction of Texas courts would not violate the federal due process clause.

Texas courts may exercise jurisdiction over a nonresident defendant when (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional guarantees of due process. *See* Tex. Civ. Prac. & Rem.Code §§ 17.041–.069; *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d

801, 807 (Tex.2002). The Texas long-arm statute authorizes the exercise of jurisdiction over a nonresident who does business in Texas. TEX. CIV. PRAC. & REM.CODE § 17.042. A nonresident "does business" in Texas for the purposes of the Texas long-arm statute if he "commits a tort in whole or in part in this state." *Id.; see also Arterbury v. Am. Bank & Trust Co.*, 553 S.W.2d 943, 946 (Tex.Civ.App.-Texarkana 1977, no writ). Because the language of the long-arm statute is broad, its requirements are met so long as the exercise of personal jurisdiction comports with the limitations of federal due process. *Coleman*, 83 S.W.3d at 806 (citing *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex.1991)).

 Personal jurisdiction over nonresident defendants satisfies the requirements of federal due process when two conditions are met: (1) the defendant has established minimum contacts with the forum state, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *BMC Software*, 83 S.W.3d at 795 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). A nonresident defendant that has purposefully availed itself of the privileges and benefits of conducting business in the foreign jurisdiction has sufficient contacts with the forum to confer personal jurisdiction. *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). A nonresident defen-

dant should not be subject to a foreign court's jurisdiction based on "random," "fortuitous," or "attenuated" contacts. *Id.* When minimum contacts have been demonstrated, the defendant must present a "compelling case" that the existence of other factors would render jurisdiction unreasonable. *Guardian Royal*, 815 S.W.2d at 231.

We first examine Tempest's contention that appellees satisfied the requirements for the exercise of jurisdiction under the Texas long-arm statute. We then address whether the exercise of jurisdiction over appellees comports with the limitations imposed by federal due process on the exercise of jurisdiction.

**A. "A Purposeful Act"—Was Jurisdiction Invoked Under the Long-arm Statute Because Imlay and the Law Firm Committed Torts in Texas?**

 Among other things, Tempest contends that Imlay and the law firm committed torts in Texas that bring them within the reach of the Texas long-arm statute. Imlay and the law firm disagree because they believe they proved that Imlay did not make any misrepresentations and he did not tortiously interfere with any contract.[3] When reaching a decision to exercise or decline jurisdiction based on the defendant's alleged commission of a tort, the trial court should rely only upon the necessary jurisdictional facts and should not reach the merits of the case. *See Ring Power Sys. v. Int'l De Comercio*

---

3. Tempest also alleged that appellees satisfied the "doing business" requirement of the long-arm statute by representing Texas residents in negotiations with other Texas residents affecting the sale of real estate in Texas, participating in the negotiations, and drafting instruments that would affect the sale of real property in Texas. Imlay and the law firm respond that they did not "do business" in Texas because Imlay was acting only as com-

munications counsel, he does not represent B or other clients in Texas, his communication with his Texas clients is only incidental to his practice before the FCC, and he does not draft or negotiate documents affecting real property in Texas. Because we have determined that Tempest's allegations and evidence support the exercise of long-arm jurisdiction based on the commission of a tort, we need not examine these other allegations.

872

& *Consultoria, S.A.,* 39 S.W.3d 350, 353 (Tex.App.-Houston [14th Dist.] 2001, no pet.). The purpose of a special appearance is not to determine liability, but whether the actions alleged by a plaintiff are of a type that suggest a defendant should expect to be subject to Texas jurisdiction. *Mort Keshin & Co., Inc. v. Houston Chronicle Publ'g Co.,* 992 S.W.2d 642, 648 (Tex.App.-Houston [14th Dist.] 1999, no pet.). "Accordingly, where the plaintiff alleges an action in tort that arose out of an act committed in Texas, the necessary proof is only that the purposeful act was committed in this State." *Ring Power,* 39 S.W.3d at 353.

In its pleadings, Tempest alleges that Imlay and the law firm committed the torts of fraud, conspiracy to defraud, and tortious interference with contract, and that this conduct caused Tempest to suffer damages. In the fraud and conspiracy to defraud causes of action, Tempest alleges that appellees and B represented that it was necessary to structure the transaction for the purchase of the radio station and the FCC license separately to avoid the violation of any FCC laws. They also made various statements and representations to Tempest that they were working to conclude the entire transaction and preparing to close on the agreement. In fact, Tempest alleges, appellees and B were actually seeking to obtain the FCC license for less than it was worth without Tempest's knowledge, and they never intended to conclude the transaction. In its tortious interference claim, Tempest alleges that appellees and B were aware of WCK's obligations to Tempest, but nevertheless induced it to ignore and violate those obligations in order to obtain the transfer of the FCC license at an egregiously discounted price. In a separate section, Tempest alleges additional facts supporting jurisdiction, including at least ten specific communications with Imlay in Texas regarding the negotiations for the radio station and the license.

At the special appearance hearing, Tempest presented testimony from Showalter in support of the specific allegations made in its first amended petition. Showalter testified that Imlay made specific representations over the telephone and in writing to him in Texas regarding the necessity of structuring the transaction to document the assignment of the FCC license separately from the sale of the radio station property and other assets, and regarding the progress of the negotiations. Showalter stated that he relied on those representations. Tempest submitted evidence of written communications from Imlay on law firm letterhead and proposed draft agreements sent to Tempest in Texas, as well as written communications and drafts from Tempest to Imlay at the law firm. Showalter also testified that there were "multiple other letters and phone calls" between him and Imlay.

Appellees contend, however, that they negated all bases of jurisdiction alleged by Tempest by demonstrating that they did not commit any torts in Texas. *See French v. Glorioso,* 94 S.W.3d 739, 746–47 (Tex.App.-San Antonio 2002, no pet.) (noting that "where jurisdiction rests upon the fact the defendant committed a tortious act, the specially appearing defendant can defeat the exercise of jurisdiction by proving that he did not do the act alleged"). We disagree.

First, appellees rely heavily on Imlay's second, more detailed affidavit, submitted with their post-hearing reply, in which he denies making misrepresentations to Tempest. As we have already determined, however, Imlay's second affidavit was not properly before the trial court because it was not timely filed. Without this affidavit, many, if not all, of Tempest's jurisdic-

tional facts as well as Tempest's allegations of misrepresentations by Imlay are undisputed.

Even if we were to consider Imlay's second affidavit, however, our conclusion that appellees failed to negate all jurisdictional bases would not change. Although Imlay denied making certain oral representations to Showalter during the negotiations, he did not dispute the contents of any of his written communications to Tempest, nor did he dispute that he made the communications. These communications support Tempest's allegations and the communications were properly before the trial court as evidence. For example, the evidence shows that, on October 24, 2001, Imlay forwarded two draft asset purchase agreements to Showalter and Gerald Benavides of B, one for the FCC license assignment and one for the radio station property and other assets. Both drafts included Tempest, B, and WCK as parties, and reflected that Tempest held a security interest in some of the station's assets. Yet, at around the same time (and unbeknownst to Showalter), on October 26, 2001, B and WCK executed the license assignment agreement that did not include Tempest as a party.[4] Although Imlay asserts in his second affidavit that there was nothing surreptitious about the assignment, he provides no explanation as to why he was drafting documents on one hand that included Tempest as a participant in both aspects of the transaction, while on the other hand, he was simultaneously drafting a separate assignment from WCK for his client.

Appellees also rely on an October 19, 2001 letter that Imlay wrote to Showalter in which he informed Showalter that B was going to acquire the FCC license and files directly from WCK. However, other letters from Imlay, both before and after the October 19 letter,[5] show that Imlay represented that he would not proceed with the FCC application for approval of the license assignment until after the parties signed the agreements. It is undisputed that, despite his representations, Imlay proceeded with obtaining FCC approval before B reached an agreement with Tempest. And, in another letter Imlay wrote to Tempest on January 10, 2002, Imlay stated that "all the necessary arrangements for the assignment of the FCC license from The Worship Center of Kingsville are now in place," implying that the assignment was set to occur sometime in the future. But, by that time, the FCC had already approved the application for the license assignment from WCK to B and the assignment had been consummated. Although appellees contend the statement is not misleading, we note that Imlay offers no explanation in his second affidavit for the inherent discrepancy in the statement.

Therefore, even if we were to consider Imlay's second affidavit, Tempest's juris-

---

4. Although Imlay states in his second affidavit that Showalter "was made aware of the assignment," he does not state when or how this took place. Showalter testified he first became aware of the license assignment agreement between B and WCK during discovery in this lawsuit. Showalter also testified that he did not learn of the FCC consent to the assignment until some time after the consent was granted.

5. One letter was a fax transmittal form, dated September 25, 2001, in which Imlay stated, "I am prepared to start the FCC application as soon as you all get these documents executed." In another letter, dated October 24, 2001, Imlay wrote, "Once these agreements are executed by all parties we will electronically file the assignment application with the FCC and will copy all parties with it" and stated that other formalities "should not preclude the filing of the FCC application once these agreements are signed."

dictional facts based on representations about the structure and progress of the transaction—made to Tempest in Texas and relied upon by Tempest to its detriment—are supported by the documentary evidence and are not negated. These jurisdictional facts are sufficient to support the exercise of long-arm jurisdiction. *See Ring Power*, 39 S.W.3d at 353–54 (noting that alleged misrepresentation committed partially in Texas satisfied requirement for jurisdiction under long-arm statute); *Mem'l Hosp. Sys. v. Fisher Ins. Agency, Inc.*, 835 S.W.2d 645, 650 (Tex.App.-Houston [14th Dist.] 1992, no writ) (holding misrepresentation made by out-of-state defendant to Texas plaintiff who relied on it in Texas satisfied requirement for jurisdiction under long-arm statute based on commission of a tort in part in Texas).

Next, appellees contend that Tempest was on constructive notice of the filing of the application seeking FCC approval for the license assignment, because it placed the application on public notice on November 13, 2001, and the FCC placed the grant on public notice on December 27, 2001. And, appellees assert, Tempest could have filed a petition to deny the assignment between those dates. However, the only evidence in the record to support any of these statements is Imlay's statement in his second affidavit that "the FCC application filed was placed on public notice for thirty days before the FCC granted the application." Appellees provide no legal authority to support their argument that the filing put Tempest on constructive notice, and do not explain how constructive notice affects Tempest's jurisdictional allegations. In any event, this "constructive notice" argument does not negate Imlay's representations to Tempest that he would file the application for FCC approval of the assignment of the license only after the parties had executed the agreements.

Appellees also attempt to dispute other allegations Tempest makes in its pleadings. For example, appellees dispute Tempest's allegation that the price paid for the assignment of the FCC license was egregiously discounted. In their brief, Imlay and the law firm contend that the price B paid for the license was "quite reasonable" and that the value of the radio station was less than Tempest alleged. However, appellees fail to highlight evidence in the record to support these contentions, and we have found none.

Appellees also argue that Tempest breached the agreements first by failing to provide certain documentation and instituting foreclosure proceedings. However, this is a legal argument in defense of Tempest's breach of contract action against B, and it does not affect Tempest's jurisdictional argument.

Finally, appellees argue that they could not have tortiously interfered in the contract between Tempest and WCK because the FCC prohibits the retention of a security interest in a broadcasting license. However, this is a legal argument that goes to the merits of Tempest's liability claims, and we need not reach it here. *See Ring Power*, 39 S.W.3d at 353; *Mort Keshin & Co.*, 992 S.W.2d at 648.

We find that, based on this record, appellees did not meet their burden to negate all jurisdictional facts alleged. Therefore, appellees failed to demonstrate that they do not satisfy the requirements for the exercise of jurisdiction under the long-arm statute based on their commission of torts in Texas.

### B. Federal Due Process is Satisfied

#### 1. *Minimum contacts*

Tempest argues that Imlay's and the law firm's contacts demonstrate a substan-

tial connection with Texas that cannot be characterized as random, fortuitous, or attenuated. Imlay and the law firm respond that their activities in representing B in the negotiations were merely incidental to Imlay's practice as communications counsel before the FCC, and therefore cannot subject them to personal jurisdiction in Texas.

 Minimum contacts requires a substantial connection between the nonresident defendant and Texas. *See Guardian Royal*, 815 S.W.2d at 226. The substantial connection must derive from the action or conduct of the nonresident, purposefully directed toward Texas. *Id.* A nonresident defendant's minimum contacts with Texas may confer either specific or general personal jurisdiction. *BMC Software*, 83 S.W.3d at 795. Our analysis in this case focuses on specific jurisdiction.

 Specific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum. *Id.* at 796. Accordingly, we focus on the defendant's activities and expectations in deciding whether it is proper to call it before a Texas court. *Coleman*, 83 S.W.3d at 806. The minimum-contacts analysis requires that a nonresident defendant "purposefully avail" itself of the privilege of conducting activities within Texas, thus invoking the benefits and protections of the laws of Texas. *Id.* The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that they reasonably could anticipate being called into a Texas court. *Coleman*, 83 S.W.3d at 806 (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). It is not the quantity but the quality and nature of the contacts that are important to the minimum-contacts analysis. *See id.* Even a single act

can support jurisdiction so long as it is substantial. *See Cartlidge v. Hernandez*, 9 S.W.3d 341, 348 (Tex.App.-Houston [14th Dist.] 1999, no pet.); *Mem'l Hosp. Sys.*, 835 S.W.2d at 650–51.

 Appellees argue that they should not be subjected to personal jurisdiction merely because Imlay was performing services on behalf of his local client. In support of this contention, they cite *Star Technology, Inc. v. Tultex Corp.*, 844 F.Supp. 295 (N.D.Tex.1993). In that case, the court found jurisdiction lacking over the nonresident defendant attorney who had traveled to Texas twice in connection with the representation of his client and filed pleadings in the lawsuit in Dallas. *Id.* at 298. The court held that these contacts were insufficient to confer specific personal jurisdiction, noting that, other than these contacts, the attorney's former representation appeared to have occurred in Washington, D.C., with the remainder handled by local counsel. *Id.*

However, *Star Technology* is easily distinguishable. Appellees suggest that Imlay did not actually engage in the negotiations with Tempest, only that he was the conduit for information or instructions from B. Contrary to this suggestion, the record demonstrates that Imlay, as B's counsel, participated in several months of negotiations with a Texas resident for a Texas radio station and its FCC license, and participated in drafting agreements affecting Texas real property and assets in Texas. These contacts were not merely random, fortuitous or attenuated. *See BMC Software*, 83 S.W.3d at 795. Appellees chose to undertake the representation of B in this matter, knowing that their client was located in Texas and that it was interested in acquiring a Texas radio station and FCC license from a Texas resi-

dent.[6] Appellees now seek to avoid the consequences of that choice.

More importantly, however, in *Star Technology,* the plaintiff alleged no specific acts by the attorney in Texas to support its allegation of conspiracy. *Id.* at 299–300. Here, Tempest alleged that Imlay made representations in Texas upon which it relied to its detriment. These allegations form the basis of Tempest's claims against Imlay and the law firm. The evidence in support of these allegations shows that appellees should have known that Imlay's representations, provided in writing and by telephone, would be relied upon by Tempest. *See Ring Power,* 39 S.W.3d at 354; *Mem'l Hosp. Sys.,* 835 S.W.2d at 650–51. The evidence is also sufficient to support a conclusion that appellees purposefully availed themselves of the benefits and protections of Texas laws when they transmitted Imlay's representations to Tempest in Texas. *See Ring Power,* 39 S.W.3d at 354; *Mem'l Hosp. Sys.,* 835 S.W.2d at 651.

Therefore, we hold that appellees did not meet their burden of negating specific jurisdiction as a basis for the trial court's exercise of jurisdiction.

### 2. *Fair play and substantial justice*

▮▮▮▮▮ Having determined that appellees had sufficient minimum contacts with Texas, we must now decide whether asserting jurisdiction comports with "traditional notions of fair play and substantial justice." *See Guardian Royal,* 815 S.W.2d at 228. In analyzing this issue, we consider the following factors: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining con-

venient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Id.* at 231. Only in rare cases will the exercise of jurisdiction not meet this test when the nonresident defendant has purposefully established minimum contacts with the forum state. *Id.*

Appellees argue that the exercise of jurisdiction over them would conflict with our decision in *D.H. Blair Investment Banking Corp. v. Reardon,* 97 S.W.3d 269, 275 (Tex.App.-Houston [14th Dist.] 2002, pet. dism'd w.o.j.), because in that case we held that D.H. Blair's mere knowledge that its actions would have effects in Texas did not equate to purposefully availing itself of the privileges and benefits of conducting business in that state. However, in that case, it was uncontested that none of D.H. Blair's alleged activities occurred in Texas, and the implied finding that it had such knowledge was the only basis for asserting jurisdiction. *Id.* at 274–75. As discussed above, appellees made direct representations to Tempest in Texas and participated in negotiations with Texas residents regarding the sale of the Texas radio station and FCC license. Therefore, the holding in *D.H. Blair* is not applicable here. We also note that, because specific jurisdiction was not found, the *D.H. Blair* court did not even discuss the fair play and substantial justice requirement. Appellees make no other argument to support their contention that exercising jurisdiction over them would offend traditional notions of fair play and substantial justice.

---

6. In connection with their argument that Imlay was retained exclusively as communications counsel and did not draft or negotiate documents affecting real property in Texas, appellees point out that B had retained local counsel to handle the actual conveyance of property in Texas. However, the record reflects very little evidence, if any, of local counsel's participation in the negotiations after Imlay and the law firm became involved.

■ Applying the fair play and substantial justice factors to this case, we find that exercising jurisdiction over appellees is not unreasonable. First, appellees have presented no evidence that defending themselves in Texas would impose a burden on them. The mere fact that they are not physically located in Texas is not persuasive. *See Ring Power*, 39 S.W.3d at 354–55 (noting that "distance alone is not ordinarily sufficient to defeat jurisdiction"). Second, Texas has a significant interest in adjudicating issues involving Texas entities and Texas property. Regarding the third and fourth factors, it is in both Tempest's and Texas's interest to obtain relief against appellees and B in a single action in Texas. Finally, the exercise of jurisdiction over appellees furthers the social policy of the states in protecting their residents from economic loss resulting from torts. *See Guardian Royal*, 815 S.W.2d at 228.

Accordingly, we hold that the exercise of specific personal jurisdiction over appellees comports with traditional notions of fair play and substantial justice.

## CONCLUSION

For the foregoing reasons, we hold that the trial court erred in granting Imlay and the law firm's special appearance. We reverse the trial court's order and remand this matter to the trial court for further proceedings.