**GREENFIELD ENERGY, INC., Greenfield Energy, Inc., and Greenfield Oil Trinidad, Ltd., Appellants**

v.

**Lawrence DUPREY and CL Financial, Ltd., Appellees.**

No. 14–07–00527–CV.

Court of Appeals of Texas, Houston (14th Dist.).

April 10, 2008.

Robert Joseph Madden, John Scott Black, Jean C. Frizzell, Robin C. Gibbs, Houston, for appellants.

Geoffrey Lloyd Harrison, Jeffery W. Chambers, Timothy F. Lee, Houston, for appellees.

Panel consists of Justices YATES, FOWLER, and GUZMAN.

## OPINION

EVA M. GUZMAN, Justice.

This is an appeal from an order granting the special appearances of appellees, a foreign company and foreign citizen. Appellants contend that the Texas contacts of two foreign subsidiary companies, wholly-owned by the foreign company, should be imputed to appellees for jurisdictional purposes. Appellants further contend that appellees' contacts with Texas are sufficient to support the jurisdiction of a Texas court. We conclude that imputation of the contacts of the subsidiaries to appellees is not warranted on this record. We further determine that appellees do not have sufficient minimum contacts with Texas to sustain special or general jurisdiction. We therefore affirm the trial court's order granting appellees' special appearances.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On January 22, 2007, Greenfield[1] sued Primera East Brighton Ltd. ("PEBL"), Primera Oil & Gas Ltd. ("POGL"), EOG Resources, Inc. ("EOG"), Lawrence Duprey ("Duprey"), and CL Financial, Ltd. ("CL Financial") alleging (a) breach of contract, (b) tortious interference with contract, (c) conspiracy to interfere with business relations, (d) fraud, (e) unjust enrichment, (f) negligent misrepresentation, (g) promissory estoppel, (h) quantum meruit, and (i) alter ego, single business enterprise, and sham to perpetrate fraud. As relevant to this appeal, Greenfield asserted that jurisdiction was proper because PEBL and POGL (collectively, "the Primera entities") allegedly

> operated ... as the "alter ego" of CL Financial Limited and Lawrence Duprey, the agent of CL Financial Limited and Lawrence Duprey[,] or as part of a single business enterprise with CL Financial Limited and Lawrence Duprey and any and all contacts with Houston, Harris County, Texas made by Defendant Primera should be imputed to Defendants CL Financial Limited and Lawrence Duprey.

CL Financial and Duprey filed special appearances, and the trial court conducted a hearing on April 30, 2007. The trial court granted the special appearances on June 12, 2007 and subsequently filed factual and legal findings on July 11, 2007. This appeal timely ensued.

### A. The Parties

Lawrence Duprey is a resident citizen of the Republic of Trinidad and Tobago who does not live and has never worked in Texas. He owns the controlling interest in CL Financial, which is a holding company based in and incorporated under the laws of the Republic of Trinidad and Tobago, with no offices or employees in Texas. In turn, CL Financial is the sole shareholder of the Primera entities.[2] Duprey is also chairman of the board of CL Financial and the Primera entities. Pat Acham, a resident of the Republic of Trinidad and Tobago, is the chief executive officer of both the

---

1. For ease of reference, we refer to appellants collectively as "Greenfield."

2. Both Primera entities are incorporated under the laws of the Republic of Trinidad and Tobago, as well as having their principal places of business in Trinidad. They have made general appearances in this suit.

Primera entities. Neither of the Primera entities have offices or employees in Texas.

Greenfield Energy, Inc. ("Greenfield Canada") is a Canadian corporation. In August 2003, two principals of this corporation, Canadian residents Ed Wenger and Larry Smyth, were introduced to Acham by a Houston resident, Jim Oberkircher. In September 2003, Wenger and Oberkircher formed a Houston company, also named Greenfield Energy, Inc. ("Greenfield Houston"),[3] and began negotiating with Acham regarding the rights to the property at the center of this dispute, an oil and gas property located off the coast of Trinidad, referred to by the parties as the "East Brighton block." The dispute in this case arises from the drilling rights to this property and an agreement between the Primera entities and Greenfield Canada and Greenfield Oil Trinidad, Ltd. ("Greenfield Trinidad").

## B. The June Letter Agreement

In June 2004, Acham and Smyth signed a letter agreement (the "June Letter Agreement").[4] Acham drafted the agreement and signed it in his capacity as chief executive officer of both Primera entities. The June Letter Agreement indicated that Greenfield Canada was signing it "on behalf of a company to be formed under the laws of the Republic of Trinidad and Toba-

go." The agreement provided that the parties would each undertake certain actions in order to "negotiate and consummate" a formal agreement and an Operating Agreement by August 31, 2004.[5] The letter also contained the following provision:

> The subject matter described herein is intended by Primera and Greenfield to remain confidential, not to be disclosed to any other party without the written consent of Primera and Greenfield, unless such disclosure is required by the Government or of the Government to whose jurisdiction any party hereto is subject or of any agency thereof.

According to Acham, he faxed this letter to Greenfield Canada from the Houston offices of EOG when he was there discussing development of other oil and gas prospects with EOG on June 29, 2004. It is primarily the alleged breach of this letter agreement and the alleged tortious interference with this agreement by CL Financial, Duprey, and EOG for which the Greenfield entities have sued.

## C. The Acquisition and Transfer of the East Brighton Block

Much of Greenfield's arguments regarding imputing the contacts of the Primera entities to CL Financial and Duprey rely on ownership of the rights to the East

**3.** Greenfield Oil Trinidad, Ltd. ("Greenfield Trinidad") is also a plaintiff in this dispute. Greenfield Trinidad is incorporated under the laws of the Republic of Trinidad and Tobago, with its principal place of business in Trinidad. There is very little information in the record concerning this corporation, and none of jurisdictional significance.

**4.** An earlier memorandum of understanding was signed by Oberkircher, on behalf of Greenfield Houston, and Acham, on behalf of the "Primera Group of Companies, Ltd." Acham acknowledged that this organization did not officially exist; however, he indicated that he was signing the memorandum in his ca-

pacity as Chief Executive Officer of both the Primera entities. Moreover, in March 2004, Oberkircher resigned from Greenfield Houston, closed down its operating accounts, assumed its leases, and began paying its one other employee as his own. Greenfield Houston was not a party to the June Letter Agreement.

**5.** Additionally, in the letter, Acham stated, "We are presently awaiting the State's Ministry of Energy's consent to have the new company (Primera East Brighton Limited) ratified to undertake exploration activity in the Block."

Brighton block. Therefore, a brief history surrounding the acquisition and subsequent transfer of these rights provides the necessary context for this case.

● In 1999, CL Financial purchased drilling and development rights to the East Brighton block, and also purchased a company named Premier Oil Fields of Trinidad, Ltd., subsequently renamed POGL. At the time CL Financial acquired the rights to the block, an existing joint operating agreement was in place between the previous operator and Petroleum Company of Trinidad & Tobago Ltd. ("Petrotrin"), which required Petrotrin's consent to any transfer of the interests to a non-affiliated company, as well as the consent of the government of Trinidad and Tobago to any transfer.

● In early March of 1999, CL Financial requested the government's consent to this transfer, which was granted in April of 1999. In July of 1999, CL Financial, the previous operator, and Petrotrin executed a novation to the joint operating agreement, substituting CL Financial into the agreement in place of the prior operator.

● CL Financial apparently intended to transfer the East Brighton assets to POGL because POGL started accounting for these assets in 1999. In 2001, the Primera entities began assembling the paperwork necessary for the transfer. In April 2002, CL Financial requested Petrotrin's consent to the transfer. Petrotrin consented to the transfer of CL Financial's rights to POGL in June 2002. Shortly thereafter, CL Financial sought governmental consent to the transfer.

● At some point during this process, the decision was made to place the drilling rights in PEBL, a newly-formed wholly-owned subsidiary of CL Financial.

● In September 2003, Pat Acham, chief executive officer of both Primera entities, wrote to Petrotrin seeking consent for the assignment of the East Brighton rights to PEBL. Shortly thereafter, Tim Gabriel of POGL sought governmental consent to the transfer.

● In November 2003, a government official contacted CL Financial, explaining that inconsistent transfers of the East Brighton rights had been requested. The official explained that CL Financial had requested permission for an assignment of the rights to POGL in 2002, and POGL had requested transfer of CL Financial's rights to PEBL in 2003.

● Because Petrotrin's consent was unnecessary to transfer the block to an affiliate, CL Financial informed Petrotrin of its intent to transfer its rights to PEBL. By June of 2004, POGL was awaiting governmental consent to the transfer so it could finalize exploration and development of the property.

● In mid–2004, POGL discovered that it did not have a copy of the original assignment paperwork conveying the previous operator's interest to CL Financial when the purchase was made of the drilling rights in 1999. In October of 2004, POGL determined that no such paperwork had been drafted or filed and that technically the rights to the East Brighton block legally belonged to the prior operator. To resolve this problem, two deeds of assignment were drafted: (1) a retroactive transfer from the previous operator to CL Financial, and (2) a prospective transfer from CL Financial to PEBL.

● In October 2005, the two transfers were finally properly documented

with appropriate deeds of assignment and the requisite government approvals. Later, a novation was signed formally substituting PEBL for CL Financial in the joint operating agreement.

### D. The Trial Court's Findings of Fact and Conclusions of Law

On April 30, 2007, the trial court conducted a hearing on CL Financial and Duprey's special appearances. At the request of the parties, on July 11, 2007, the trial court made findings of facts and conclusions of law on their special appearances. Regarding specific jurisdiction, the trial court made the following findings.

#### 1. Plaintiffs' Allegations

In this lawsuit, plaintiffs allege that "defendants" traveled to Texas and executed the June Letter Agreement or that the "[c]ontract at issue was executed by Defendants in Texas." Plaintiffs also allege that "defendants" "subsequently traveled to Houston, Texas" to interfere with plaintiffs' contractual rights. However, neither Duprey nor CL Financial signed either the June Letter Agreement or the memorandum of understanding. Additionally, there is no evidence linking either Duprey or CL with the interference claims or with Texas. The Court finds that there is no evidence supporting these jurisdictional allegations.

Plaintiffs allege that Duprey and CL [Financial] "wrongfully directed others to execute the agreements" with plaintiffs and conspired with EOG to interfere with the June Letter Agreement. The Court finds that there is no evidence of Duprey or CL [Financial] directing anyone to perform any act of jurisdictional significance.

Finally, plaintiffs allege that Duprey and CL [Financial] committed fraud against them and negligently provided false information to them. The Court finds that there is no evidence that Duprey or CL [Financial] were involved in any fraud or misrepresentations. Greenfield cannot point to any (1) evidence of representations that Duprey or CL [Financial] made to them, (2) evidence of defendants' intent to deceive, or (3) evidence of plaintiffs' reliance upon the putative representations.

#### 2. Negotiations with EOG

Greenfield argues that CL Financial, through Gita Sakal, negotiated a confidentiality agreement with EOG. However, Greenfield's evidence does not show a jurisdictional contact, because EOG Trinidad initiated the contact, CL Financial is not a party to the confidentiality agreement, and the confidentiality agreement is not a contact with Texas.

The confidentiality agreement upon which Greenfield focuses is between [PEBL] and EOG Resources Trinidad Limited; CL Financial did not sign it. When EOG Trinidad received its copy of the agreement, Acham sent it with a cover letter on [PEBL] letterhead. Further, even if CL [Financial] had signed the agreement, it would be a contact with Trinidad, because the agreement is with EOG Trinidad.

#### 3. The Memorandum of Understanding

Greenfield also argues that a December 2, 2003 memorandum of understanding between the "Primera Group of Companies" and Greenfield Houston is a CL Financial contact with Texas. Greenfield suggests that the "majority of negotiations [took] place in Texas." The evidence that Greenfield offers for this contention is a reference by Larry Smyth that Jim Oberkircher began these negotiations "in November, 2003 from Houston, Texas." This evidence does not show that a majority of the

negotiations took place in Texas. In fact, Oberkircher himself testified that he and Ed Wenger initiated the contact with Acham in Trinidad, never met with Acham anywhere but Trinidad, and—most importantly—never had contact with CL Financial, Duprey, or anyone acting as an agent for either. There is no credible evidence that the negotiations took place in Houston—all of the credible evidence shows that Trinidad was where the memorandum of understanding was negotiated. In any event, all of the evidence is that Greenfield initiated this contact. It is not a Texas contact for CL Financial, or any other organization.

In addition to Oberkircher's testimony that Greenfield never contacted anyone at CL [Financial], the plain fact remains that CL Financial did not sign the [m]emorandum of [u]nderstanding. Acham signed the memorandum for the "Primera Operating Group of Companies, Ltd." Primera Operating Group is not, as Greenfield points out, the proper name of any of the Primera companies, but that does not matter for jurisdictional purposes. Use of the name might lead to confusion between the various Primera companies, but it is not evidence that CL Financial signed the memorandum.

The evidence does not show that Primera was acting as CL Financial or as an agent of CL Financial. Primera performed actions "on behalf" of CL Financial in the same sense that any wholly-owned subsidiary performs actions "on behalf" of its sole shareholder, which is to say that Primera performed actions which would benefit its parent company and sole shareholder. The evidence does not show any exercise of control that exceeds what would normally be expected in a parent-subsidiary corporate relationship. Additionally, none of this evidence refers to the mem-

orandum of understanding, so it does not support Greenfield's argument that CL Financial, in effect, signed the memorandum.

### 4. Gaffney, Cline

In February 2000, Acham accepted a fee schedule from Gaffney, Cline & Associates, a technical consulting firm, by signing it on behalf of CL Financial and Primera. This is not a jurisdictional contact because Greenfield is not complaining about the representations made based on the Gaffney, Cline report. Neither Gaffney, Cline nor the representations themselves are substantially related—or related at all—to Greenfield's claims.

The trial court further found that there was no evidence of systematic and continuous contacts that would support general jurisdiction over Duprey or CL Financial. Specifically, the trial court found as follows regarding the imputation of the contacts of the Primera entities to CL Financial or Duprey:

### 1. Alter Ego and Single Business Enterprise

The evidence shows that the defendants meet the Texas tests for corporate separateness. CL [Financial], [POGL], and [PEBL] are separate and distinct companies. [POGL] and [PEBL] have management that is independent from that of CL Financial Limited. The testimony showed that:

(1) Acham makes all of the hiring decisions for the Primera companies and that CL [Financial] has no influence in those decisions.

(2) Each of the Primera companies generate[s] separate annual audits of [its] finances.

(3) Each of the Primera companies file[s] separate tax returns.

(4) CL [Financial] does not itself loan money to any of the Primera entities.

(5) [POGL]'s payroll system is completely independent from that of CL Financial.

(6) CL Financial and the Primera companies keep separate accounting records.

(7) The daily operations of the Primera companies and CL Financial do not overlap.

(8) There are structural barriers between the Primera entities and CL Financial.

(9) CL [Financial] and the Primera companies have neither common business departments nor common shareholder or board meetings.

(10) CL [Financial] and the Primera entities do not share any common employees.

(11) The Primera companies and CL [Financial] have no undocumented fund transfers.

(12) Primera and CL [Financial] do not combine profits or losses.

The Court finds, as a matter of fact, that there is no evidence supporting any type of alter ego or single business enterprise theories with respect to CL Financial, [POGL], and [PEBL].

## 2. Agency

The testimony showed that Acham made the day-to-day decisions at both Primera entities. The CEOs of CL Financial's subsidiaries exercised independent judgment as to how their companies are run. During the period in which CL Financial held the East Brighton rights, Primera was conducting operations on the prospect. Primera, unaware that there was a problem with the transfer of the East Brighton interest, was managing day-to-day activities with respect to the interest. The intent of both CL Financial and Primera was for Primera to handle all of the oil and gas activities in the block. So, for instance, when it was time to contract for test wells on the prospect, it was [POGL] that hired Halliburton. There is no evidence that CL [Financial] exerted control over the details of the work of the Primera entities.

Finally, the trial court made the following legal conclusions:

The Court finds that Lawrence Duprey does not conduct business in the State of Texas, and thus lies outside of the reach of Texas's long-arm statute. However, even if Duprey w[ere] doing business within the [S]tate, his contacts with the [S]tate were not purposeful. The [C]ourt finds that Duprey's contacts were random, isolated and fortuitous. Additionally, there is no evidence that Duprey sought any benefit from Texas state law, such that he impliedly consented to the jurisdiction of the Texas courts. Duprey had no contacts with Texas that were related to plaintiffs' allegations. The Court finds that the facts do not justify imputing the jurisdictional contacts of any other party to Duprey.

Like Duprey, CL Financial does not conduct business in the State of Texas, and thus does not fall within the reach of the state long-arm statute. Even if that were not the case, CL [Financial]'s contacts with the State were not purposeful. The Court finds that its contacts were random, isolated and fortuitous. Additionally, there is no evidence that CL [Financial] sought any benefits from Texas state law, such that it impliedly consented to the jurisdiction of the Texas courts. Like Duprey, CL [Financial] had no contacts with Texas that were related to plaintiffs' allegations. The Court finds that the facts do not justify imputing the jurisdictional contacts of any other party to CL [Financial].

## II. Issues Presented

In its first issue, Greenfield contends the trial court erred in finding that Duprey and CL Financial do not have sufficient minimum contacts with Texas to justify an exercise of specific or general jurisdiction over them. Specifically, Greenfield asserts that (a) the Primera entities' contacts should be imputed to Duprey and CL Financial, (b) these imputed contacts support general jurisdiction, and (c) both Duprey and CL Financial's own contacts support the exercise of specific jurisdiction. In its second issue, Greenfield argues that the trial court erred in finding that asserting jurisdiction over appellees would not comport with traditional notions of fair play and substantial justice.

## III. Standard Of Review

■■■ Whether a trial court has personal jurisdiction over a defendant is a question of law. *Schott Glas v. Adame*, 178 S.W.3d 307, 312 (Tex.App.-Houston [14th Dist.] 2005, pet. denied), *abrogated on other grounds by PHC–Minden, L.P. v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 169 (Tex.2007). The trial court, however, must frequently resolve questions of fact before deciding the jurisdictional question. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex.2002). If the trial court rules on a special appearance and issues findings of fact and conclusions of law, we review the findings of fact on legal and factual sufficiency grounds and review the conclusions of law de novo. *See Silbaugh v. Ramirez*, 126 S.W.3d 88, 94 (Tex. App.-Houston [1st Dist.] 2002, no pet.) (citing *BMC Software*, 83 S.W.3d at 794).

■■■ Personal jurisdiction is proper if a defendant has established "minimum contacts" with Texas and the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex.2002) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)). "The purpose of the minimum-contacts analysis is to protect the defendant from being haled into court when its relationship with Texas is too attenuated to support jurisdiction." *Id.* Such an analysis requires that a defendant "purposefully avail" itself of the privilege of conducting activities within the state of Texas, thus invoking the benefits and protections of Texas law. *Id.*

■■■ Personal jurisdiction exists if the nonresident defendant's minimum contacts give rise to either specific or general jurisdiction. *See PHC–Minden*, 235 S.W.3d at 166. Specific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum. *See id.* General jurisdiction, in contrast, arises from continuous and systematic contacts with the forum such that the forum may exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted in the forum state. *See id.*

## IV. Analysis

■■■ As noted above, Greenfield relied on theories of agency, alter ego, and single business enterprise to support general jurisdiction over CL Financial and Duprey, as well as alleging specific jurisdiction over both. A defendant asserting a special appearance bears the burden of proving that its contacts with the forum state do not satisfy the minimum contacts test. *See, e.g., Am. Type Culture Collection, Inc.*, 83 S.W.3d at 806. But "the party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities must prove this allegation." *BMC Software*, 83 S.W.3d at 798 (alter ego theory); *see also Coleman v. Klöckner & Co. AG*, 180 S.W.3d 577, 588 (Tex.App.-Hous-

ton [14th Dist.] 2005, no pet.) (agency theory). Because Greenfield relies first on the imputation of the Primera entities' contacts to CL Financial and Duprey to meet the minimum contacts test, we begin our analysis with the theories alleged by Greenfield to support such imputation.

## A. Imputing the Contacts of the Primera Entities

### 1. Alter Ego Theory

▬ Greenfield first asserts that the Primera entities' jurisdictional contacts should be imputed to Duprey and CL Financial based on an alter ego theory.[6] The Texas Supreme Court recently clarified the factors relevant to such an inquiry:

> To "fuse" the parent company and its subsidiary for jurisdictional purposes, the plaintiffs must prove the parent controls the internal business operations and affairs of the subsidiary. But the degree of control the parent exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities ceased to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice.

*PHC–Minden,* 235 S.W.3d at 175 (quoting *BMC Software,* 83 S.W.3d at 799). The Court also emphasized that a "subsidiary corporation will not be regarded as the alter ego of its parent merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of the control that stock ownership gives to stockholders." *Id.* (quoting *Gentry v. Credit Plan Corp. of Houston,* 528 S.W.2d 571, 573 (Tex.1975)).

As noted above, the trial court found the Primera entities and CL Financial to be separate and distinct companies, with independent management, boards of directors, and accounting practices. Our review of the record finds support for these findings. For example, Patrick Chin, the financial controller of Primera Oil Field Management Services, another of the entities owned by CL Financial that provides management and financial services to several of its subsidiaries, including, as is relevant here, the Primera entities, testified in a deposition that there was no overlap between the daily operations of CL Financial, POGL, and PEBL. He stated that the "day-to-day" decisions of both Primera entities were made by Acham as their chief executive officer. Chin testified that the Primera entities and CL Financial file separate tax returns, keep separate accounts, and have separate home offices. According to Chin, CL Financial billed the Primera entities for legal services provided by Gita Sakal, the legal officer for CL Financial. The Primera entities paid for these services. Chin additionally knew of no transfers of funds between the companies.

Sakal's deposition testimony confirmed much of Chin's description of the relationship between the Primera entities and CL Financial. According to her, Acham was authorized to enter into the June Letter Agreement because he was "charged with responsibility of the operations of the company." Acham testified in a deposition that CL Financial was not involved in the day-to-day drilling activities, even when it was technically still the owner of the East Brighton block. Acham acknowledged that Duprey, as chairman of the Primera entities, had the "final say." But Acham emphasized that it was Acham himself who was charged with running the day-to-day operations of the Primera entities:

> Q: During the entire time once you took the job at Primera and you came down to Trinidad—during the entire time you were there or that

---

**6.** Greenfield has not asserted a single-business-entity theory on appeal.

you have been there, has Mr. Duprey dictated to you the way you are to run Primera?

A: No.

Q: When you have had discussions with Mr. Duprey, what has been his role concerning Primera?

A: He has always acted as an officer, chairman of Primera, providing guidance and business advice whenever necessary.

. . .

Q: When you went to Trinidad and started your work, who to your understanding actually had held or initially held the license for the drilling opportunity in the East Brighton? What was your understanding at the time?

A: CL Financial.

Q: And what was your understanding of CL's intent and desire with respect to the interest in the East Brighton fields?

A: CL's intent was to have Primera handle all their oil and gas activities. They actually passed everything on to Primera for Primera to handle.

. . .

Q: As far as day-to-day operations of the East Brighton block, who was responsible for those day-to-day operations as of the date of the [June Letter Agreement]?

A: Primera.

Thus, even though CL Financial may have retained legal ownership of the East Brighton block during the time that the Primera entities and Greenfield negotiated

and entered into the June Letter Agreement,[7] there is no indication in the record that either of the Primera entities were operating on "behalf" of CL Financial. Finally, Duprey stated in his deposition that his only involvement with the Primera entities was as chairman of the entities' respective boards.

Greenfield has not established that CL Financial controlled the internal business operations and affairs of the Primera entities to any extent greater than that normally associated with common ownership and directorship. *See id.* Accordingly, the trial court did not err in concluding that there is "no evidence supporting any type of alter ego or single business enterprise theories with respect to CL Financial, [POGL], and [PEBL]." We therefore conclude that the Primera entities' contacts cannot be imputed to CL Financial under the alter ego theory alleged by Greenfield.

■ The same facts establishing that the Primera entities are separate and distinct corporations also negate general jurisdiction over Duprey individually based on a theory of alter ego. *See, e.g., D.H. Blair Inv. Banking Corp. v. Reardon,* 97 S.W.3d 269, 277 (Tex.App.-Houston [14th Dist.] 2002, pet. dism'd w.o.j.) (stating that " 'jurisdiction over an individual generally cannot be based on jurisdiction over a corporation with which he is associated unless the corporation is the alter ego of the individual' ") (quoting *Vosko v. Chase Manhattan Bank, N.A.,* 909 S.W.2d 95, 99 (Tex.App.-Houston [14th Dist.] 1995, writ denied)). Although a corporate officer is not protected from the exercise of specific jurisdiction if the officer engaged in tor-

---

**7.** Indeed, as noted above, the original deed assigning the drilling rights from the former operator of the East Brighton prospect to CL Financial was not filed until July 30, 2005, well after the June letter agreement and the events transpiring thereafter that form the basis of this lawsuit. The deed of assignment, however, operated retrospectively to July 1, 1999, because that is when the parties actually agreed to the assignment.

tious or fraudulent conduct directed at the forum state,[8] we address this issue separately *infra,* when we consider whether Duprey negated the exercise of specific jurisdiction.

## 2. Agency Theory

 Greenfield next asserts that the Primera entities' contacts with Texas should be imputed to Duprey and CL Financial for jurisdictional purposes because the Primera entities served as the agents of Duprey and CL Financial. In conducting a jurisdictional inquiry, an agent's contacts may be imputed to a principal to establish the requisite minimum contacts. *See Coleman,* 180 S.W.3d at 588. But "agency will not be presumed, and the party asserting the relationship has the burden of proving it." *Id.*

 Generally, whether one describes the theory for imputing one corporation's contacts to another as a theory of agency or alter ego, the critical test remains that of the right or exercise of control. *See Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U.S. 333, 335, 45 S.Ct. 250, 250–51, 69 L.Ed. 634 (1925) (rejecting agency theory for imputing corporation's contacts to sole shareholder where the existence of the company "as a distinct corporate entity is, however, in all respects observed"); *Bank of Am. v. Whitney Cent. Nat'l Bank,* 261 U.S. 171, 173, 43 S.Ct. 311, 312, 67 L.Ed. 594 (1923) ("The jurisdiction taken of foreign corporations, in the absence of statutory requirement or express consent, does not rest upon a fiction of constructive presence, like 'qui facit per alium facit per se.'"[9]); *PHC–Minden,* 235 S.W.3d at 175 (rejecting the "single business enterprise" jurisdictional theory and describing "the relevant factors for jurisdictional veil-

piercing," including the extent to which the "the parent controls the internal business operations and affairs of the subsidiary" or conversely, whether the subsidiary is "separate and distinct from its parent corporation"); *BMC Software,* 83 S.W.3d at 799 (considering "alter ego" theory and concluding that "[t]o 'fuse' the parent company and its subsidiary for jurisdictional purposes, the plaintiffs must prove the parent controls the internal business operations and affairs of the subsidiary"); *K.D.F. v. Rex,* 878 S.W.2d 589, 597 (Tex.1994) (orig.proceeding) (holding that a Kansas general partnership created to hold securities on behalf of a Kansas governmental entity and operating solely upon the direction of the governmental entity with no discretion of its own was an agent of that entity and was not subject to Texas jurisdiction in its individual capacity); *Gentry,* 528 S.W.2d at 573 (explaining that a subsidiary corporation will be regarded as the alter ego of its parent "where management and operations are assimilated to the extent that the subsidiary is simply a name or conduit through which the parent conducts its business ..."); *Coleman,* 180 S.W.3d at 588 ("The critical element of an agency relationship is the right to control, and the principal must have control of both the means and details of the process by which the agent is to accomplish his task in order for an agency relationship to exist."). Thus, the pertinent inquiry in this case is whether CL Financial or Duprey controlled both the means and details of the Primera entities' activities regarding the East Brighton block. And because agency is not presumed, Greenfield bears the burden of proving that such control exists. *See Coleman,* 180 S.W.3d at 588.

**8.** *See id.* (citing *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)).

**9.** "He who acts through another acts himself [i.e., the acts of an agent are the acts of the principal]." Black's Law Dictionary 1249 (6th ed.1990).

### 1. No Evidence of Control

For the reasons previously discussed, we agree with the trial court's conclusion that there is no evidence CL Financial exerted control over the details of the work of the Primera entities. The record reflects that CL Financial legally owned the rights associated with the East Brighton block, but it is clear that POGL conducted operations on the prospect almost from the start.

### 2. No Evidence of Actual or Apparent Authority

 There also is no indication that the Primera entities were authorized to act as agents for either CL Financial or Duprey. *See id.; Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 549 (Tex.App.-Houston [14th Dist.] 2003, no pet.). "Actual authority is created through written or spoken words or conduct of the principal communicated to the agent." *Bottle Rock Power Corp.*, 108 S.W.3d at 550–51. Apparent authority, on the other hand, "is created by written or spoken words or conduct by the principal to a third party." *Id.* at 550. Greenfield has not directed us to any written or spoken words or conduct by CL Financial or Duprey that communicated the Primera entities' actual or apparent authority as their agents.

### 3. No Evidence of Ratification

"Whether or not an agent is initially authorized to act on behalf of a principal, the agent's actions may be attributed to the principal, for purposes of personal jurisdiction, if the principal later ratifies the agent's conduct." *Id.* at 552. Ratification may occur when a principal supports, accepts, or follows through on the efforts of a purported agent. *Id.* Greenfield asserts that because the Primera entities' activities in pursuing development of the East Brighton block benefitted CL Financial and Duprey as the legal owners of the block, CL Financial and Duprey ratified the alleged agency relationship.

This argument, however, ignores the fact that, rather than retaining the rights to the East Brighton block, CL Financial ultimately transferred these rights to PEBL. In fact, as discussed above, throughout the time that Greenfield claims the Primera entities were operating as the agents of CL Financial and Duprey, both the Primera entities and CL Financial were actively seeking to transfer the rights from CL Financial to the Primera entities. Thus, there is nothing in the record to support a ratification theory of agency.

In sum, Greenfield has not established that CL Financial or Duprey controlled the means and details of the Primera entities' actions in attempting to develop the East Brighton prospect. Moreover, Greenfield has provided no basis from which we may conclude that the Primera entities were authorized to act as CL Financial or Duprey's agents. Finally, Greenfield has not established that CL Financial or Duprey ratified the Primera entities' actions regarding the East Brighton block. Because an agency relationship cannot be presumed, we conclude that the trial court properly determined that none existed in this case.

Greenfield has not provided any viable basis to impute the contacts of the Primera entities to CL Financial or Duprey. We therefore turn to the issue of whether CL Financial or Duprey themselves have sufficient minimum contacts to support an exercise of jurisdiction over them.

### B. CL Financial and Duprey's Alleged Contacts with Texas

In support of both general and specific jurisdiction, Greenfield also alleges the following contacts by CL Financial individually: (a) the confidentiality agreement with EOG, (b) the memorandum of understanding, and (c) a 2000 reserve analysis related to the East Brighton block provided by a

Houston-based consulting firm. In addition, Greenfield asserts that both CL Financial and the Primera entities' East Brighton-related contacts should all be imputed to Duprey because he "personally directed" these subordinate entities and their employees to take action directed at Texas. We address each of these alleged contacts in turn.

### 1. Negotiations with EOG

■■■■■ Only the defendant's contacts count in a jurisdictional analysis. *See Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 785 (Tex.2005) (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985)). Here, the negotiations with CL Financial were initiated by EOG Trinidad, not EOG Houston. Further, the agreement resulting from these discussions is an agreement with EOG Resources Trinidad, Ltd. Thus, even if this were a jurisdictional contact, we agree with the trial court that this contact would be a Trinidadian contact. Moreover, CL Financial is not a party to the confidentiality agreement, which is between EOG Trinidad and the Primera entities. The negotiations with EOG were therefore not a Texas contact of CL Financial.

### 2. Memorandum of Understanding

■■■ As the trial court pointed out, the evidence indicates that the negotiations leading up to the execution of the memorandum of understanding took place in Trinidad, not Texas. There is no evidence that CL Financial was involved in any Texas contact at all. As the trial court concluded, "Use of the name [Primera Operating Group of Companies, Ltd.] might have lead to confusion between the various Primera companies, but it is not evidence that CL Financial signed the memorandum." Thus, the memorandum of understanding is not a Texas contact of CL Financial.

### 3. 2000 East Brighton Block Reserve Analysis

■■■ Although Acham purportedly accepted the Houston-based consulting firm's fee schedule on behalf of CL Financial and the Primera entities, he testified that he was not authorized to commit CL Financial and that it was a mistake to sign the fee schedule as if he were. Moreover, this contact predates the relevant time period by more than three years; the fee schedule was signed in early 2000. By its own admission, Greenfield did not become involved in the East Brighton block until late 2003. Finally, the record reflects that POGL hired and paid for the services provided by this consulting firm. We agree with the trial court that this contact is not related to the operative facts of this case. We further conclude that this contact is a contact of POGL rather than CL Financial.

### 4. Duprey's "Contacts" with Texas

■■■ Greenfield offers little new argument in this section of its briefing that has not been previously addressed in the alter ego or agency sections of this opinion, *supra.* Greenfield suggests that Duprey directed and controlled the East Brighton block-related activities of CL Financial and the Primera entities. We have already determined that neither Duprey nor CL Financial directed or controlled the day-to-day activities of the Primera entities. We have also concluded that CL Financial had no jurisdictionally significant contacts with Texas. Thus, we need not repeat our analysis here. There is no evidence that Duprey engaged in any tortious or fraudulent conduct directed at Texas,[10] nor that he participated in the negotiation of the mem-

---

**10.** *See D.H. Blair Inv. Banking Corp.,* 97 S.W.3d at 277–78.

orandum of understanding or the June letter agreement.

In sum, the trial court did not err in finding that CL Financial and Duprey do not have sufficient minimum contacts with Texas to justify an exercise of either general or specific jurisdiction over them under the Texas long arm statute. We therefore overrule Greenfield's first issue, and do not reach its second issue.

### V. CONCLUSION

We conclude that the contacts of the Primera entities may not be imputed to CL Financial or Duprey under an alter ego or agency theory. Additionally, we conclude neither CL Financial nor Duprey have sufficient minimum contacts to justify an exercise of jurisdiction over them. Accordingly, we overrule Greenfield's first issue. Because of our disposition of this issue, we need not consider whether exercising jurisdiction over CL Financial or Duprey would comport with traditional notions of fair play and substantial justice.[11] We therefore affirm the trial court's judgment granting the special appearances of CL Financial and Duprey.

---

11. *See Int'l Shoe Co.*, 326 U.S. at 316, 66 S.Ct. at 158. Although unnecessary to our resolution of Greenfield's complaint, our precedent suggests that haling CL Financial or Duprey into a Texas court would also offend traditional notions of fair play and substantial justice. *See Moni Pulo Ltd. v. Trutec Oil & Gas, Inc.*, 130 S.W.3d 170, 180–81 (Tex.App.-Houston [14th Dist.] 2003, pet. denied); *Alenia Spazio,*

*S.p.A. v. Reid*, 130 S.W.3d 201, 220–22 (Tex. App.-Houston [14th Dist.] 2003, pet. denied), *cert. denied,* —— U.S. ——, 127 S.Ct. 136, 166 L.Ed.2d 36 (2006); *see also Primrose Drilling Ventures, Ltd. v. Nealwell Drilling, Ltd.*, No. 14–98–00618–CV, 2000 WL 890622, at *8 (Tex.App.-Houston [14th Dist.] July 6, 2000, no pet.) (not designated for publication).