ACCEPTED
03-15-00335-CV
6376886
THIRD COURT OF APPEALS
AUSTIN, TEXAS
8/5/2015 6:21:30 PM
JEFFREY D. KYLE
CLERK

No. 03-15-00335-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
8/5/2015 6:21:30 PM
JEFFREY D. KYLE
Clerk

_____

**HERBERT ROLNICK,**

*Appellant,*

**v.**

**SIGHT'S MY LINE, INC., A FLORIDA CORPORATION; STEWART LANTZ; RIGGS ALESHIRE & RAY; BLAZIER, CHRISTENSEN, BIGELOW & VIRR; AND ADAMS & GRAHAM,**

*Appellees.*

_____

Interlocutory Appeal from the 200th Judicial District Court in Travis County, Texas, the Honorable Time Sulak, Presiding
_____

**BRIEF OF APPELLEES**
**SIGHT'S MY LINE, INC. AND STEWART LANTZ**
_____

J. Hampton Skelton
State Bar No. 18457700
hskelton@skeltonwoody.com
Brandon Gleason
SKELTON & WOODY
248 Addie Roy Road, Suite B-302
Austin, Texas 78746
Telephone: (512) 651-7000
Facsimile: (512) 651-7001

Craig S. Hilliard
chilliard@stark-stark.com
STARK & STARK
A Professional Corporation
P.O. Box 5315
Princeton, New Jersey 08543-2315
Telephone: (609) 896-9060
Facsimile: (609) 895-7395

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... i

INDEX OF AUTHORITIES ....................................................................................... ii

I.      Statement of the Case ................................................................................1

II.     Statement Regarding Oral Argument .........................................................2

III.    Statement Concerning Jurisdiction ............................................................3

IV.     Issues Presented .........................................................................................4

V.      Statement of Facts .....................................................................................5

     A.      *Background* .......................................................................................5

     B.      *Rolnick's Substantial Contacts with Texas* .....................................7

VI.     Summary of Argument ..............................................................................15

VII.    Legal Argument and Authorities ...............................................................17

     A.      *Standard of Review* ...........................................................................17

     B.      *In Personam Jurisdiction* ..................................................................19

     C.      *Agency Principles and Personal Jurisdiction* ...................................26

     D.      *The trial court properly determined that Rolnick had substantial contacts with Texas sufficient to confer personal jurisdiction and it is both fair and just for this Court to assert personal jurisdiction.* ......27

     E.      *Alternatively, it is proper to confer personal jurisdiction on Rolnick through application of agency principles.* ...................................35

# INDEX OF AUTHORITIES

**CASES**

*Abilene Diagnostic Clinic, PLLC v. Paley & Prof'l Ass'n of Golf Officials,*
364 S.W.3d 359 (Tex. App.—Eastland 2012, no pet.) ....................................33

*Am. Type Culture Collection, Inc. v. Coleman*,
83 S.W.3d 801 (Tex. 2002) .............................................................................19

*Bergenholtz v. Cannata,*
200 S.W.3d 287 (Tex. App.—Dallas 2006, no pet.)............................... 26, 35

*BMC Software Belgium, N.V. v. Marchand*
83 S.W.3d 789 (Tex. 2002). ......................................................... 17, 18, 19, 38

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ....................................................................... 21, 25, 26

*Casino Magic Corp. v. King,*
43 S.W.3d 14 (Tex. App.—Dallas 2001, pet. denied) ....................................17

*CMH Homes v. Perez*,
340 S.W.3d 444 (Tex. 2011) ...........................................................................17

*Gordon & Doner, P.A. v. Joros,*
287 S.W.3d 325 (Tex. App.—Fort Worth 2009, no pet.) ......................... 24, 34

*Greenfield Energy, Inc. v. Duprey,*
252 S.W.3d 721 (Tex. App.—Houston [14th Dist.] 2008, no pet.).... 26, 27, 36

*I & JC Corp. v. Helen of Troy L.P.*,
164 S.W.3d 877  (Tex. App. [Eighth District] 2005) ................... 18, 19, 28, 35

*In re King's Estate*,
150 Tex. 660 (Tex. 1951)................................................................ 18, 28, 35

*Kawasaki Steel Corp. v. Middleton*,
    699 S.W.2d 199 (Tex. 1985)......................................................................... 18, 38

*Keeton v. Hustler Magazine, Inc.*,
    465 U.S. 770 (1984) ..................................................................................... 21, 34

*Langston, Sweet & Freese, P.A. v. Ernster,*
    255 S.W.3d 402 (Tex. App.—Beaumont 2008, pet. denied).................... 24, 25

*Markette v. X-Ray X-Press Corp.*,
    240 S.W.3d 464 (Tex. App.—Houston [14th Dist.] 2007, no pet)......................
    ..................................................................................................... 22, 28, 32, 33

*Masada Investment Corp. v. Allen*,
    697 S.W.2d 332 (Tenn. 1985) .........................................................................34

*McGee v. Int'l Life Ins. Co.*,
    355 U.S. 220 (1957) .......................................................................................21

*Moki Mac River Expeditions v. Drugg*,
    221 S.W.3d 569 (Tex. 2007) ...................................................................... 20, 21

*Moncrief Oil Int'l v. OAO Gazprom*,
    414 S.W.3d 142 (Tex. 2013)....................................................................... 21, 31

*Moni Pulo Ltd. v. Trutec Oil & Gas, Inc.,* ............................................................
    130 S.W.3d 170 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)…25, 34

*Mountain States Employers Council, Inc. v. Cobb Mech. Contractors, Inc.*,
    No. 2-07-462-cv, 2008 WL 2639711 (Tex. App.—Fort Worth, July 3, 2008,
    no pet.)...............................................................................................................22

*Ogletree v. Matthews*,
    262 S.W.3d 316 (Tex. 2007) ...........................................................................17

*Olympia Capital Assocs., L.P. v. Jackson,*
    247 S.W.3d 399 (Tex. App.—Dallas 2008, no pet. ................................. 26, 36

*Ramm v. Rowland*,
   658 F. Supp. 705 (S.D. Tex. 1987) ........................................................ 22, 23

*Rowland & Rowland, P.C. v. Texas Emplrs. Indem. Co.*,
   973 S.W.2d 432 (Tex. App.—Austin  1998, no pet.) .....................................31

*Spir Star AG v. Kimich*,
   310 S.W.3d 868 (Tex. 2010)................................................................. 19, 25

*Tempest Broad. Corp. v. Imlay*,
   150 S.W.3d 861 (Tex. App.—Houston [14th Dist.] 2007, no pet.)......... *passim*

*Worford v. Stamper*,
   801 S.W.2d 108 (Tex. 1990).........................................................................19

*Zac Smith & Co., Inc. v. Otis Elevator Co.,*
   734 S.W.2d 662 (Tex. 1987)................................................................. 25, 34

## STATUTES

   TEX. CIV. PRAC. & REM. CODE § 51.014(a)(7) ...............................................3, 17

   TEX. CIV. PRAC. & REM. CODE § 17.042....................................................... 20, 22

TO THE HONORABLE JUSTICES OF THE THIRD COURT OF APPEALS:

Appellees Sight's My Line, Inc. and Stewart Lantz respectfully submit this brief in response to the brief of Appellant Herbert Rolnick.

## I.    Statement of the Case

This is a professional malpractice case arising from legal services provided to Plaintiffs, Sight's My Line, Inc. ("SMLI") and Stewart Lantz ("Lantz"), during the course of a Texas commercial transaction.  Plaintiffs assert claims of professional malpractice against Defendants Herbert Rolnick ("Rolnick"), Riggs Aleshire & Ray, P.C. ("RAR" or "Ray"), Blazier, Christensen, Bigelow & Virr, P.C. ("BCBV") and Adams & Graham, LLP ("A&G") arising from that Texas transaction.  CR:261.[1] Rolnick filed a special appearance challenging the trial court's exercise of personal jurisdiction over him.  The special appearance was opposed by Plaintiffs and all three of Rolnick's co-defendants.  The trial court overruled Rolnick's special appearance and this appeal followed.  CR:697-700.

---

[1] The appellate record consists of a clerk's record (referenced herein as "CR:[page number]") and a one volume reporter's record (referenced herein as "RR:[page number]").

## II. Statement Regarding Oral Argument

Appellees believe oral argument would assist the Court in deciding this matter as it will give the Court the opportunity to question the parties on the facts and applicable law.

### III. Statement Concerning Jurisdiction

This Court has jurisdiction of this matter pursuant to section 51.014(a)(7) of the Texas Civil Practice and Remedies Code, which allows an interlocutory appeal when a court grants or denies the special appearance of a defendant under Texas Rule of Civil Procedure 120a.

## IV.    Issues Presented

This case presents the following issue:

1.    Did the trial court properly determine Rolnick is subject to personal jurisdiction in Texas when Rolnick a) directly provided legal services in a Texas commercial transaction on behalf of a company based in Texas with assets, including real property, located in Texas, and b) directly communicated, collaborated and presided over the transaction along with the other defendant attorneys, who were at all relevant times, located in Texas and engaged to assist Rolnick in providing legal services to plaintiffs?

### V. Statement of Facts

#### A. *Background*

Rolnick served as Lantz' personal counsel on various matters related to his businesses, since at least 1998. CR:262. Rolnick was also corporate counsel to Plaintiff, SMLI, a business operating exclusively within the State of Texas, since the inception of the company in and around 2002. *Id.* Rolnick was lead counsel for the plaintiffs in the commercial transaction at issue in this lawsuit. That transaction involved a sale of SMLI's assets, located in Texas, and included lengthy negotiations related to SMLI's business in the State of Texas. *Id.* Rolnick contacted, directly communicated and collaborated with the other defendants, who were at all relevant times, located in Travis County, Texas, to assist him in rendering legal services. *Id.* Rolnick was involved in preparing a purchase agreement, security agreement and other necessary transaction documents. He directly shared them with the other defendants. *Id.*

On October 15, 2012, SMLI entered into an Asset Purchase Agreement (the "Purchase Agreement") with American Optical Services, LLC, a Delaware limited liability company ("AOS") and AMEDCO Texas, LLC, a Texas limited liability company (collectively referred to as the "Debtors"). CR:139, 262-263. Under the terms of the Purchase Agreement, SMLI agreed to sell and transfer to the Debtors substantially all of SMLI's assets relating to the ownership and operation of a chain

5

of five (5) optometry and related retail sales establishments conducting business under the trade name "EYEAR ONE HOUR OPTICAL, a Texas Corporation" (the "Business"). CR:139. All of the retail outlets were located in Texas.

Debtor Amedco, a Texas entity, agreed to purchase the assets of SMLI (located in Texas) consisting of, among other assets, leasehold rights, rights to title of land located in San Benito, Texas, patient records and prescription drugs. CR:139, 263; 357-376. The purchase price of the assets, subject to various adjustments, was $2,550,000.00. CR:139. The Debtors paid a portion of the purchase price by assuming plaintiff SMLI's liabilities, including the accounts payable, in the aggregate principal amount of $993,250.00. *Id.* The balance of the purchase price was to be paid by the Debtors over a five (5) year period in accordance with the terms of a Secured Promissory Note (the "Note"). *Id.*

The parties closed on the transaction on November 1, 2012, executing the Note and a Security Agreement (the "Security Agreement") on November 9, 2012. The Security Agreement provided plaintiff SMLI a security interest in certain "Collateral." *Id.* This security interest was to be perfected by the filing of a UCC-1 financing statement (the "Financing Statement" or "UCC-1 Statement"). *Id.*

Plaintiffs were represented by Rolnick from inception through completion of the AOS transaction. CR:263. Rolnick reviewed the relevant transaction documents, including the UCC-1 Statement, which was ultimately (and incorrectly,

6

as even Rolnick now concedes) filed in the office of the Texas Secretary of State on January 8, 2013 at his direction. *Id.* The UCC-1 Statement, needed to secure SMLI's interest in the Collateral as part of the Purchase Agreement, was never filed in Delaware as required by chapter nine of the Texas Business and Commerce Code. AOS defaulted on the promissory note and ultimately filed for bankruptcy in Delaware. *Id.* Due to Defendants' negligence, and failure to properly file the UCC-1 Statement, Plaintiffs ended up with an unsecured claim in the AOS bankruptcy. CR:142.

On January 29, 2015, Plaintiffs filed their First Amended Petition against Defendants. CR:137. On March 9, 2015, Rolnick filed his Answer and an unsworn special appearance seeking dismissal for lack of personal jurisdiction of the claims in Plaintiffs' First Amended Petition. CR:147. The parties subsequently conducted limited discovery on the jurisdictional issue raised in the special appearance. On May 14, 2015, the trial court overruled Rolnick's special appearance and this appeal followed. CR:697-700.

### B. *Rolnick's Substantial Contacts with Texas*

Rolnick was the primary attorney handling the AOS transaction on behalf of Plaintiffs. In his capacity as lead counsel, Rolnick advised Plaintiffs in substantive areas related to Texas landlord tenant law, repayment of a Texas Medicaid claim and terms to be included in the Purchase Agreement. CR:264, 297-299. Rolnick was

7

clear that his legal services were requested, at least in part, to "help [Plaintiffs] minimize the possibility of a default by the [Texas] Buyer." *Id.*

Lantz testified that Rolnick formed SMLI around 2002 for the sole purpose of operating retail eyeglass locations in Texas. CR:264, 390. Rolnick testified that he understood the AOS transaction involved the sale of assets, all of which were located in Texas. CR:504 at 11:8-11. Rolnick was asked about his involvement in handling the AOS transaction:

> Q: So far as negotiating and, well, communicating with AOS about terms and potential changes in terms, who did that?
>
> A: I believe that I exclusively dealt with AOS in terms of, from a legal point of view . . . .

CR:505 at 15:20-25.

Indeed, Rolnick further testified that it was "entirely within his dominion to handle" the transaction. CR:508 at 29:9-16. He further testified that he reviewed the UCC-1 Statement prior to the closing date. CR:509 at 31:7. Notably, Rolnick could not remember whether Ray had reviewed the UCC-1 Statement prior to closing. CR:509 at 31:1-6. The record demonstrates that Rolnick expended considerable thought on when and where to file the UCC-1 Statement. He testified that he wanted to have the "actual list of everything that was to be a collateral asset" prior to sending the UCC-1 Statement to Texas counsel. CR:509 at 33:14-20.

Rolnick, as lead counsel, decided on the proper location to file the UCC-1. In fact, he advised Lantz in a September 12, 2012, email that "it does not make sense to me that Nevada law should apply to a Security Agreement that is to be recorded in Texas pursuant to the requirements of Texas law." CR:301-305.

On September 12, 2012, Rolnick wrote Lantz a letter to summarize his telephone conversation concerning "the most recent red-lined version of the Asset Purchase Agreement." CR:301-305. In that letter, Rolnick advised Lantz that he could not close the AOS deal without first obtaining the consent from his current lender, Eyear One Hour Optical, a Texas Corporation. *Id.* Lantz asked Rolnick to assist in drafting the paperwork needed to memorialize the consent. CR:307.

Rolnick drafted an Agreement for Assumption of Note and Chattel Mortgage that was sent to Edward E. Crittenden, the President of Eyear One Hour Optical, a Texas Corporation. CR:309-315. The Agreement involved a Promissory Note and Chattel Mortgage recorded in Texas. *Id.*

Rolnick felt it was prudent to collaborate with Texas counsel regarding numerous issues associated with the AOS transaction. For example, Rolnick expressed concern regarding Plaintiffs' ability to protect their assets in the event of a default, and discussed this with Ray. CR:297-299, 320. Rolnick conferred with Ray regarding the negotiations of the AOS transaction on numerous occasions. CR:322-330. Rolnick worked with Texas counsel to discuss various issues,

testifying he made numerous phone calls into Texas. CR:505 at 17:1-15, CR:507 at 23:13-19, CR:515.

Lantz testified that Rolnick called Ray, who was located in Texas, to discuss the AOS transaction:

> Q: So Mr. Rolnick did contact Mr. Ray on your behalf, correct?
>
> A: Yes.
>
> Q: Okay, and he communicated directly with Mr. Ray on your behalf, correct?
>
> A: Yes.
>
> Q: And Mr. Ray presumably talked with Mr. Rolnick at times on your behalf, correct?
>
> A: Yes.

CR:387 at 30:17-25.

Rolnick was actively involved in all aspects of the negotiation process. In fact, he remained an active participant in the discussions concerning the Promissory Note. Ray asked Rolnick for his legal advice on where the UCC-1 Statement should be filed. Ray asked Rolnick, in writing: "Where will the assets be held? Texas right? Shouldn't the UCC-1Statement be filed where the assets are located?" CR:332-336.

10

Rolnick worked to consummate the AOS transaction and, according to Ray, remained responsible for making sure the deal complied with Texas law. CR:552 at 29:20-25, CR:553 at 32:10-15. Ray testified that Rolnick failed to respond to his and BCBV's[2] comments on the legal documents. CR:553 at 33:3-13. Ray interpreted this to mean that Rolnick would remain responsible for determining whether the documents complied with Texas law. *Id.*; CR:561 at 63:15-25.

Ray testified that Rolnick "directed him" to file the UCC-1 Statement in Texas. CR:555 at 39-40:1-5, CR:558 at 50:6-9, CR:560 at 60:5-11, CR:562 at 69:13-22. Ray testified as follows:

Q: Was it your testimony earlier that it was Mr. Rolnick that requested you file [the UCC-1 Financing Statement] in Texas?

A: I remember that conversation. **It was a directive.**

CR:562 at 69: 2-12 (emphasis added).

Ray testified that he believed he was retained by Rolnick to perform certain legal services:

Q: Is there any documentation that you can point us to, to indicate that Mr. Rolnick retained you?

---

[2] Paul Browder, Esq., a lawyer with the firm BCBV, assisted the other defendants in reviewing the transaction documents at issue in this case. Mr. Browder was contacted directly by defendant Ray. CR:549-550.

A: I think the series of emails back and forth between his office and the letters that he sent directing -- directing us to do certain things, and I think the documents he attached and my fee bills indicating that my conversations with him all point to the fact that he retained us to perform a review of the documents, to look at the documents.

Q. You were doing so on behalf of Mr. Lantz, though, correct?

A. I don't -- I don't know that I'd considered it a difference. I mean, obviously [Lantz] was selling the business, but that's kind of a team effort, in the sense that Rolnick wanted somebody to look at the documents, and Stew wanted me.

CR:556 at 44:9-25.

Ray further testified that he was acting at the direction of Rolnick:

Q: Who was giving you directives or orders or requests?

A: Well, it depends. I mean, [Rolnick] said, "Work—I mean, Lantz, Stew Lantz said, '[Rolnick's] handling it. Work with [Rolnick]."

Q: Did you ever have any communications regarding the transactions with Mr. Lantz after that?

A: I don't believe—not anything substantive because [Lantz] didn't know anything about the legal stuff. He was trusting Herb to handle it.

CR:561 at 65:1-11.

12

Ray testified that Lantz never asked him to perform any specific task related to the AOS transaction. CR:562 at 68:14-15.

Ray testified that he assumed Rolnick had reviewed and made changes to the transaction documents. CR:560 at 59:9-13. He further testified that Rolnick had "prepared" the UCC-1 Statement. CR:560 at 59:14-19. On January 3, 2013, Rolnick sent Ray the "original UCC-1 Financing Statement with Exhibits and the original Security Agreement to be recorded." CR:356. Undeniably, Rolnick had extensive involvement in the drafting and implementation of the UCC-1 Statement, a document of significant importance in this litigation. On the face of the UCC-1 Statement, Rolnick was identified as the individual to send "acknowledgment." CR:358-377.

Lantz testified that he had no contact with any attorney at BCBV, even though the firm performed work in Texas, related to the AOS transaction. CR:387 at 31:16-19. Lantz testified that he had never communicated with any attorney at BCBV. *Id.* Ray communicated directly with BCBV, outside of Lantz' presence. CR:387 at 32:2-7.

Rolnick took the lead in obtaining information needed to close the transaction. Notably, Rolnick was responsible for obtaining a "list of tangible assets" to be included in the UCC-1 Financing Statement. CR:338-340.

Historically, Rolnick served as counsel for plaintiffs related to various landlord tenant matters in Texas. CR:342-352. Rolnick performed work on behalf of Plaintiffs in their capacity as landlord on various Texas properties. Many of these properties were involved in the AOS transaction. CR:354. Lantz testified that he was the owner of A.S.I.A. Properties, a Texas limited liability corporation. CR:392 at 50:20-25. Lantz further testified that he traveled to Texas every other week to visit his businesses. CR:383 at 14:10-12, CR:390 at 44:1-4.

Rolnick was paid handsomely for his efforts to secure the closing of the AOS transaction. He testified he received a flat fee in excess of $40,000.00 for his efforts. CR:514 at 53:12-15. Lantz remembered the number being closer to $50,000.00. CR:394.

Rolnick testified that he narrowly assigned specific responsibilities to Ray (i.e. to ensure that plaintiffs would have enforceable rights in the event of foreclosure). CR:516. Rolnick further testified that he accepted and/or ratified Ray's suggestions "pretty much without question." CR:516 at 61:10-13.

## VI. Summary of Argument

As lead counsel closing a Texas-based transaction, Rolnick took a series of purposeful actions that permitted him to directly benefit from providing legal services in Texas. Rolnick served as general counsel to plaintiff SMLI, which operated five stores exclusively within Texas. Rolnick had no trouble accepting a substantial fee to broker the sale of SMLI and distribute its assets (all of which were located in Texas). He accepted his role as the quarterback for the Texas transaction. Serving as lead counsel for many of the key aspects of the transaction, Rolnick handled the closing, reviewed and drafted the UCC-1 Statement, compiled a list of SMLI's assets (all of which were located in Texas), and drafted various legal documents related to leases and property situated in Texas. The other Texas attorneys, all of whom were involved in the transaction, believed that Rolnick was responsible for making sure the deal complied with Texas law. Indeed, Ray testified that Rolnick directed him to file the UCC-1 Statement in Texas, pursuant to Texas law.

Rolnick falls woefully short of satisfying his burden of proof on this appeal. The trial court considered the pleadings, special appearance briefing, evidence and argument of counsel in overruling the special appearance. The record demonstrates that Rolnick performed extensive legal services in Texas. Rolnick's contacts with

Texas were purposeful and direct, and the trial court's decision was correct and should be affirmed.

## VII. Legal Argument and Authorities[3]

### A. *Standard of Review*

An order granting or denying a special appearance is an interlocutory, appealable order. TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7). Interlocutory orders may be appealed only if permitted by statute and only to the extent jurisdiction is conferred by statute. *Ogletree v. Matthews*, 262 S.W.3d 316, 319 n.1 (Tex. 2007). Statutes authorizing interlocutory appeals are strictly construed because they are a narrow exception to the general rule that interlocutory orders are not immediately appealable. *CMH Homes v. Perez*, 340 S.W.3d 444, 447 (Tex. 2011).

On appeal, the trial court's factual findings are reviewed for legal and factual sufficiency and the trial court's legal conclusions are reviewed *de novo*. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). In reviewing a trial court's ruling on a special appearance, the plaintiff has the initial burden of pleading allegations sufficient to bring the nonresident defendant within the provisions of the Texas long-arm statute. *Id.* at 193. At the special appearance

---

[3] The trial court's ruling may be affirmed for the sole reason that Rolnick failed to file a verified special appearance as required by the Texas Rules of Civil Procedure. The arguments and authorities articulated by Ray regarding the issue are hereby incorporated by reference for all purposes. *See* Appellee's Br. at p. 9-11. Plaintiffs urge the Court to affirm the trial court's ruling on the same basis. *See Casino Magic Corp. v. King*, 43 S.W.3d 14, 18 (Tex. App.—Dallas 2001, pet. denied).

hearing however, the nonresident challenging the court's assertion of personal jurisdiction must negate *all* jurisdictional bases. *Id.*; *Tempest Broad. Corp. v. Imlay*, 150 S.W.3d 861, 867 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (emphasis added);[4] *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex. 1985). The trial court must make findings of fact to resolve the jurisdiction question. *BMC Software*, 83 S.W.3d at 794. When the trial court does not issue findings of fact and conclusions of law with its special appearance ruling, all facts necessary to support the judgment and supported by the evidence are implied, and presumed to support the judgment. *Id.* at 795. A party may challenge the legal and factual sufficiency of the trial court's implied findings. In this situation, the appellant faces a substantial burden. In reviewing a factual sufficiency challenge, a trial court's decision will be "set aside only if its ruling is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust." *In re King's Estate*, 150 Tex. 660, 662 (Tex. 1951); *I & JC Corp. v. Helen of Troy L.P.*, 164 S.W.3d 877, 884 (Tex. App.- El Paso 2005, no pet.) (noting the appellate court will only set aside a finding of the trial court if the finding is so against the great weight and preponderance of

---

[4] The *Tempest* court, presiding over the appeal of a denied special appearance related to an out-of-town attorney's contacts in Texas, applied a deferential review to the trial court's findings where it did not file findings of fact or conclusions of law. *Id.* at 868. The *Tempest* court noted that trial judges often did not file their conclusions because the "record makes the judge's thoughts crystal clear." *Id.* The *Tempest* court held that application of a *de novo* standard of review was inappropriate and applied the more deferential standard to the trial court's decision. *Id.*

the evidence as to be manifestly erroneous or unjust). Further, in reviewing a legal sufficiency challenge, the appellant's claim will fail if there is "more than a scintilla of evidence to support the finding." *BMC Software*, 83 S.W.3d at 794; *Tempest*, 150 S.W.3d at 867. If evidence supports the implied findings of fact, the appellate court "must uphold the trial court's judgment on any legal theory supported by the findings." *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). This is so regardless of whether the trial court articulates the correct legal reason for the judgment. *I & JC Corp.,* 164 S.W.3d at 884 (internal citation omitted).

## B. *In Personam Jurisdiction*

Upon filing a special appearance, the nonresident defendant "assumes the burden to negate all of the plaintiff's alleged bases of personal jurisdiction." *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 807 (Tex. 2002). The trial court should overrule a defendant's special appearance when the plaintiff's claims arise from and are related to defendant's contacts with Texas. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 874 (Tex. 2010).

The touchstone of personal jurisdiction under Texas law is "purposeful availment." With respect to nonresidents, the Texas long-arm-statute permits the exercise of jurisdiction over a nonresident defendant that "does business" in Texas. TEX. CIV. PRAC. & REM. CODE § 17.042 (Vernon 2008). According to the Texas Supreme Court:

19

Personal Jurisdiction is proper when the nonresident defendant has established minimum contacts with the forum state, and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. Minimum contacts are sufficient for personal jurisdiction when the nonresident defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws.

*Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007) (internal citations and quotations omitted). The Court continued:

[T]here are three parts to a "purposeful availment" inquiry. First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. Thus, [s]ellers who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to the jurisdiction of the latter in suits based on their activities. Finally, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction.

*Id.* With respect to nonresidents, the nonresident's contacts:

may give rise to two types of personal jurisdiction. If the defendant has made continuous and systematic contacts with the forum, general jurisdiction is established whether or not the defendant's alleged liability arises from those contacts. In contrast . . . [s]pecific jurisdiction is established if the defendant's alleged liability aris[es] out of or [is] related to an activity conducted within the forum.

20

*Id.* at 575-576.

At its core, the purposeful availment analysis "seeks to determine whether a nonresident's conduct and connection to a forum are such that it could reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985).

When analyzing the defendant's contacts, courts should consider the quality and nature of the contacts, in deciding whether personal jurisdiction is appropriate. *Moncrief Oil Int'l v. OAO Gazprom*, 414 S.W.3d 142, 151 (Tex. 2013). A substantial connection can result from even a single act. *Id.* (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)) (emphasis added).

It is "beyond dispute that a forum has significant interest in redressing injuries that actually occur within the State." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776 (1984) (observing "A state has an especial interest in exercising judicial jurisdiction over those who commit torts within its territory . . . because torts involve wrongful conduct which a state seeks to deter . . . by providing that a tortfeasor shall be liable for damages which are the proximate result of his tort."). Allegations that a nonresident defendant did business in Texas by committing a tort (such as legal malpractice), in whole or in part, in Texas, are sufficient to satisfy the literal language of the Texas long-arm statute. TEX. CIV. PRAC. & REM. CODE ANN. §17.042(2) (Vernon 2008); *Mountain States Employers Council, Inc. v. Cobb Mech.*

21

*Contractors, Inc.*, No. 2-07-462-cv, 2008 WL 2639711, at * 1 (Tex. App.—Fort Worth, July 3, 2008, no pet.). Notably, the Texas courts have held, in the context of a legal malpractice action that the proper inquiry should focus on the "operative facts of the underlying litigation" as they relate to the defendant attorney's Texas contacts. *See Markette v. X-Ray X-Press Corp.*, 240 S.W.3d 464, 468 (Tex. App.—Houston [14th Dist.] 2007, no pet).

In *Ramm v. Rowland*, 658 F. Supp. 705 (S.D. Tex. 1987), the plaintiff brought suit against a New Jersey defendant alleging alienation of the affection of his wife. *Id.* at 708. The court concluded that the defendant was subject to Texas jurisdiction even though his only contacts with the forum state were several phone calls and a few letters from outside the forum. *Id.* (noting that an out of state defendant has "fair notice" when he purposefully directs action at the forum and the underlying litigation arises from or is related to the action). The court reasoned that the defendant's acts of intentionally contacting the plaintiff's wife by phone to encourage her to leave her husband is the very essence of the tort. *Id.* The court also mentioned that it is a fact of "modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence in a state in which business is conducted." *Id*.

In *Tempest,* on a set of facts similar to this case, the appellate court held that a nonresident attorney should be subject to personal jurisdiction in Texas. Tempest,

22

a Texas entity, had sold a radio station and FCC license to a third party buyer. Tempest retained a security interest in the FCC license. *Tempest*, 150 S.W.3d at 795. The buyer eventually defaulted and Tempest sought to resell the station and license to another purchaser. *Id.* Defendant Imlay, a nonresident attorney, was retained by the new purchaser, B Communications, to buy the station and FCC license from Tempest. *Id.* However, unbeknownst to Tempest, Imlay brokered a deal, on behalf of B Communications, to purchase the FCC license from the defaulted previous buyer. *Id.* Tempest sued B Communications and the nonresident attorney Imlay for numerous torts related to the undisclosed deal concerning the FCC license. Personal jurisdiction was proper where the nonresident attorney "forwarded two draft asset purchase agreements to counsel for B Communications" along with other "representations about the structure and progress of the transaction" which were relied upon by the plaintiff to his detriment. *Id*. at 873-74. In *Tempest*, the nonresident attorney argued he was merely the "conduit for information" flowing in and out of Texas and therefore, personal jurisdiction was lacking. *Id*. at 875. The court of appeals disagreed and found sufficient contacts for personal jurisdiction where the nonresident attorney "participated in several months of negotiations with a Texas resident . . . and participated in drafting agreements affecting Texas real property and assets in Texas." *Id*.

23

Notably, Appellant's Brief ignores *Tempest*, and instead focuses on cases which are far less analogous. For example, in *Gordon & Doner, P.A. v. Joros,* 287 S.W.3d 325 (Tex. App.—Fort Worth 2009, no pet.), the nonresident Florida law firm (Gordon & Doner) referred a Florida resident's case to a Texas lawyer with the expectation that the lawsuit be filed in New York. *Id.* at 328. The Texas law firm failed to timely file a complaint and the Florida resident sued the Florida and Texas law firms for, in part, professional malpractice. *Id.* The Florida law firm filed a special appearance arguing the Texas court did not have personal jurisdiction. *Id.* The court granted the special appearance because the Florida law firm did not perform any substantive work in Texas (and did not otherwise have sufficient contacts to Texas). *Id.* at 336.

Notably, the Court in *Gordon & Doner*, cited two cases to suggest that, with different facts, the analysis would change and personal jurisdiction would be proper. In the first case, *Langston, Sweet & Freese, P.A. v. Ernster,* 255 S.W.3d 402, 407 (Tex. App.—Beaumont 2008, pet. denied), the court held that a partnership's contacts with Texas were not imputed to the individual nonresident partner for purposes of personal jurisdiction analysis, <u>absent evidence the partner participated in litigation in Texas</u> or had other individual contacts. (emphasis added). *Id.* The second case, *Moni Pulo Ltd. v. Trutec Oil & Gas, Inc.,* 130 S.W.3d 170, 175 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) held "it is true that membership in a

24

joint venture between nonresidents may establish minimum contacts if the business focuses on Texas." *See also Zac Smith & Co., Inc. v. Otis Elevator Co.,* 734 S.W.2d 662 (Tex.1987) (finding personal jurisdiction was proper where the basis of the underlying dispute was "wholly performable in Texas" and the parties "parties anticipated a profit . . . in Texas").

The second consideration in assessing whether personal jurisdiction is proper is analysis of whether "the exercise of jurisdiction comports with traditional notions of fair play and substantial justice." *Spir Star AG*, 310 S.W.3d at 872 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The terms "fair play" and "substantial justice" are imprecise. *Id.* However, when a nonresident defendant "has purposefully availed itself of the privilege of conducting business in a foreign jurisdiction, it is both fair and just to subject that defendant to the authority of the forum court." *Id.* (citing *Burger King Corp.,* 471 U.S. at 475). Only in "rare cases" will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has minimum contacts with the forum state. *Burger King*, 471 U.S. at 471.

The fairness determination considers five factors: 1. the burden on the defendant; 2. the interests of the forum state in adjudicating the dispute; 3. the plaintiff's interest in obtaining convenient and effective relief; 4. the interstate judicial system's interest in obtaining the most efficient resolution of controversies;

25

and 5. the shared interest of the several states in furthering social policies. *Bergenholtz v. Cannata,* 200 S.W.3d 287, 295–97 (Tex. App.—Dallas 2006, no pet.) (internal citations omitted).

### C. *Agency Principles and Personal Jurisdiction*

A nonresident defendant may also be subject to personal jurisdiction through principles of agency law. *Olympia Capital Assocs., L.P. v. Jackson,* 247 S.W.3d 399, 406 (Tex. App.—Dallas 2008, no pet.). More specifically, the "contacts of an agent may be sufficient to confer jurisdiction upon the principal." *Id.* (internal citation omitted); *see also Greenfield Energy, Inc. v. Duprey,* 252 S.W.3d 721 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (noting an "agent's contacts may be imputed to a principal to establish the requisite minimum contacts"). An agent is "one who consents to the control of another to conduct business or manage some affair for the other, who is the principal." *Id.* (internal citation omitted).

When analyzing the relationship between the parties, the Court will decide whether actual or apparent authority exists. *Id.* Actual authority is "created by written or spoken words or conduct by the principal to a third party." *Id.* Apparent authority is "created by written or spoken words or conduct by the principal to a third party. *Id.*

Notwithstanding the presence of actual or apparent authority, an agent's actions "may be attributed to the principal, for purposes of personal jurisdiction, if

26

the principal later ratifies the agent's conduct." *Id*. Ratification occurs "when a principal supports, accepts or follows through on the efforts of a purported agent." *Id*. Here, as outlined below, the attorneys based in Texas were engaged by, and took their direction from, Rolnick. Accordingly, the undeniable contacts of the Texas-based lawyers can be imputed to Rolnick. To conclude otherwise would allow an out-of-state counsel to escape jurisdiction, by merely engaging "local counsel" in Texas to perform steps in Texas at his direction.

### D. *The trial court properly determined that Rolnick had substantial contacts with Texas sufficient to confer personal jurisdiction and it is both fair and just for this Court to assert personal jurisdiction.*

Appellant fails to properly consider or discuss the applicable standard of review that must be used by this Court in reviewing the trial court's implied findings of fact and law. The standard of review provides the framework for this Court's consideration of the trial court's denial of Rolnick's special appearance. To reiterate, all questions of fact addressed by the trial court are, at this point, <u>presumed</u> to support the trial court's judgment. *I & JC Corp.,* 164 S.W.3d at 884 (internal citation omitted) (emphasis added). The trial court's finding of fact must remain undisturbed unless it is so "contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust." *In re King's Estate*, 150 Tex. at 662. Accordingly, this Court's appellate review is deferential to the trial court's findings. For the

27

reasons to be discussed below, the record here clearly justifies the court's decision to overrule Rolnick's special appearance.

Rolnick cannot carry his heavy burden to negate personal jurisdiction. The record overwhelmingly establishes his comfortable familiarity with the practice of law within the Texas borders. Rolnick's presence within Texas is well established and undeniable. In fact, Rolnick's relationship with SMLI was (and always had been), forged on the provision of legal services in Texas. CR:390.

Here, the proper focus must remain on Rolnick's contacts (and malpractice) committed in Texas, as they relate to the underlying claims in the plaintiffs' Amended Petition. *See Markette,* 240 S.W.3d at 466. Rolnick had substantial contacts directly with Texas that are germane to the claims in this lawsuit:

    a.    Rolnick formed SMLI in or around 2002 for the purpose of creating a corporation that could purchase assets held in Texas and establish retail eyeglass store operations; CR:390, CR:514.

    b.    Rolnick served as lead counsel, acting as the quarterback for plaintiffs' legal team to complete the AOS transaction. The AOS transaction was a Texas deal involving assets held in Texas with a selling company that operated multiple locations in Texas.

c.    Rolnick testified that he "exclusively dealt with AOS" in regards to certain legal services relevant to the overall AOS transaction;  CR:505 at 15:20-25.

d.    Ray testified that Rolnick was responsible for ensuring the agreement complied with Texas law.  CR:556 at 29:20-25.

e.    Ray testified that Rolnick "directed him" to file the UCC-1 Statement in Texas.  CR:555 at 39-40:1-5, CR:558 at 50:6-9, 60:5-11, CR:562 at 69:1-22.

f.    Ray testified that he believed he was retained <u>by Rolnick</u> to perform certain legal services.  CR:556 at 44:9-25; CR:561 at 65:1-11.

g.    Indeed, Rolnick testified that it was "entirely within his dominion to handle the closing" part of the transaction.  CR:508 at 29:9-16. He further testified that he reviewed the UCC-1 Financing Statement prior to the closing date. *Id*. at 31:7.  Notably, Rolnick could not remember whether Ray had reviewed the UCC-1 Statement prior to closing.  *Id*. at 31:1-6. Rolnick expended considerable thought on when to file the UCC-1 Financing Statement.  He testified that he wanted to have the "actual list of everything that was to be a collateral asset" prior to sending the UCC-1 to Texas counsel. *Id*. at 33:14-20.  Rolnick made a judgment regarding the proper location to file the UCC-1 Statement. He advised Lantz in a September 12, 2012, email

that "it does not make sense to me that Nevada law should apply to a Security Agreement that is to be recorded in Texas pursuant to the requirements of Texas law." CR:301-305.

      h.     Rolnick held himself out as competent and well versed in Texas law as manifest by the Agreement for Assumption of Note and Chattel Mortgage that he drafted and sent to Edward E. Crittenden, the President of Eyear One Hour Optical, a Texas Corporation. CR:309-315, CR:341-354.

      i.     Rolnick was actively involved in all aspects of the negotiation process. In fact, he remained an active participant in the discussions concerning the Promissory Note. Ray asked Rolnick for his legal advice on where the UCC-1 Financing Statement should be filed. Ray asked Rolnick, in writing: "Where will the assets be held? Texas right? Shouldn't the UCC-1 be filed where the assets are located?" CR:332-336. Contrary to Rolnick's assertion, he repeatedly and purposefully conferred with the other co-defendants, including Ray and it is simply incorrect to characterize these contacts as "fortuitous." *See* Appellant's Br. at p. 25.

      j.     Rolnick took the lead in obtaining information needed to close the transaction. Notably, Rolnick was responsible for obtaining a "list of tangible assets" to be included in the UCC-1 Statement. CR:338-340. Again, these assets were located in Texas.

k. Rolnick worked with Texas counsel to discuss various issues, testifying he made numerous phone calls into Texas. CR:505 at 17:1-15, CR:507 at 23:13-19, CR:515.

A substantial connection can result from even a single act. *Moncrief Oil Int'l,* 414 S.W.3d at 151; *see also Rowland & Rowland, P.C. v. Texas Emplrs. Indem. Co.,* 973 S.W.2d 432, 435-436 (Tex. App.—Austin 1998, no pet.) (finding nonresident law firm had sufficient contacts to satisfy the Texas long-arm statute based on two acts: 1) the firm sent a letter into Texas indicating it would continue to provide representation on various legal issues; and 2) the firm distributed a substantial portion of a $217,000.00 wrongful death judgment to Texas residents). As articulated herein, the record demonstrates multiple acts and omissions related to Rolnick's performance of legal services, and contacts necessary to provide those services, within Texas.

The facts of this case are strikingly similar to *Tempest,* a case noticeably absent from Appellant's Brief. Like in *Tempest*, Rolnick, the nonresident attorney, "participated in several months of negotiations . . . and participated in drafting agreements affecting Texas real property and assets in Texas." *Tempest Broad. Corp.,* 150 S.W.3d at 875. Moreover, Rolnick drafted various asset purchase agreements and made numerous "representations to [plaintiffs] regarding the structure and progress of the transaction" just like the nonresident defendant in

31

*Tempest*. *Id*. For these reasons personal jurisdiction exists and the trial court decision should be affirmed.

The facts here are distinguishable from *Markette,* in a meaningful way. *See Markette*, 240 S.W.3d at 466. In *Markette*, the nonresident attorney represented the Texas client in a litigation pending in Indiana. The nonresident attorney committed malpractice in Indiana, concerning advice provided in relation to the Indiana litigation. *Id*. (emphasis added). That negligence had a collateral consequence in Texas, where the client resided. However, the attorney did not purport to, or ever actually engage in, a transaction or dispute connected to or actually pending in Texas. As such, the *Markette* court found there was no personal jurisdiction over the nonresident Indiana law firm merely because it "communicated advice to the client [located in Texas]." *Id*. at 468. Here, Rolnick was paid a substantial fee to handle the AOS transaction which involved 1) the negotiation of the sale of a business consisting of five Texas locations; 2) a company with assets located in Texas; and 3) the consideration of multiple areas of Texas law. Again, Texas law was so intimately involved in the details of these negotiations that local counsel was engaged to assist. Notwithstanding this collaboration, Rolnick remained the primary counsel in all aspects of the legal work. The substandard legal work, which has caused plaintiffs' injuries, occurred because of a shared failure to properly act (per the standard of care) according to Texas law. The substandard legal services,

32

**occurred within Texas** as this deal was, at its core, a Texas transaction involving real estate and personal property in Texas with Texas companies.[5]

Here, the collective efforts of the defendants (both the residents and the nonresident Rolnick) contributed to the Plaintiffs' damages. The Defendants' collective legal judgment, a sum of its respective parts, occurred in Texas. The fact that one of the legal team's contributing members, Rolnick, was physically located outside of Texas is not dispositive and cases such as *Abilene Diagnostic Clinic, PLLC v. Paley & Prof'l Ass'n of Golf Officials,* 364 S.W.3d 359, 365 (Tex. App.—Eastland 2012, no pet.) do not prevent this the exercise of personal jurisdiction over Rolnick in this case.

This case is also notably different than *Gordon & Doner* for one primary reason. Here, Rolnick focused his legal efforts on a deal that took place within Texas, with Texas assets and Texas entities. Rolnick received substantial compensation for his work in structuring the Texas deal. *See Zac Smith & Co.*, 734 S.W.2d at 665; *Moni Pulo, Ltd.*, 130 S.W.3d at 17; *see also Masada Investment Corp. v. Allen*, 697 S.W.2d 332 (Tenn. 1985) (holding that nonresident attorney

---

[5] Notably, counsel for Rolnick discussed the *Markette* decision at length during the oral argument for the special appearance. RR:11-18. The trial court properly refused to adopt Rolnick's strained and inaccurate interpretation of the case.

subject to personal jurisdiction where attorney knew his legal services would affect real property in forum state).

Further, the exercise of personal jurisdiction over Rolnick comports with due process requirements. The factors overwhelmingly balance in favor of plaintiffs' position. First, the burden on the defendant is minimal as he is represented by Texas counsel and will not be needed to make frequent travel to Texas during the pendency of the litigation. Second, Texas has a clear interest in adjudicating the tort alleged here. *Keeton,* 465 *U.S.* 770. Third and fourth, the Plaintiffs will be greatly prejudiced if they are forced to litigate this matter in two separate venues (in two different states). It should be noted that neither Plaintiffs nor Plaintiffs' lead counsel are citizens of Texas. The Plaintiffs have already incurred significant expense litigating this matter in a foreign forum. Additionally, the absence of Rolnick from this case creates a possibility that the other defendants will "point the finger at him" in an attempt to avoid liability and capitalize on his absence from the case. This result must be avoided. *See Bergenholtz,* 200 S.W.3d at 293.

Appellant cannot, and has not, demonstrated that the trial court's decision is clearly wrong or manifestly unjust. Rolnick cites numerous examples of "undisputed evidence" in support of the unpersuasive argument that he lacked minimum contacts with Texas. (Appellant's Br. at 18). Notably, each of these alleged facts was presented to the trial court at the time of its decision. Also notable

is the marginal relevance of most of these alleged facts.[6] Rolnick cannot marshal support a) to demonstrate that personal jurisdiction is lacking; and b) to overcome the presumption that the trial court properly considered the record facts. *I& JC Corp.,* 164 S.W.3d at 884. For the reasons discussed above, the trial court's decision is not "clearly wrong or manifestly unjust" and Rolnick has failed to vault his substantial burden of proof on this appeal. *In re King's Estate*, 150 Tex. at 662. The proofs demonstrating purposeful availment are compelling and there is substantially more than a "scintilla of evidence" to support the trial court's conclusions. *Tempest*, 150 S.W.3d at 867. For these reasons, the trial court properly overruled Rolnick's special appearance.

### E. *Alternatively, it is proper to confer personal jurisdiction on Rolnick through application of agency principles.*

A nonresident defendant may also be subject to personal jurisdiction through principles of agency law. *Olympia Capital Assocs., L.P. v. Jackson,* 247 S.W.3d 399, 406 (Tex. App.—Dallas 2008, no pet.). More specifically, the "contacts of an

---

[6] Many of the alleged facts, set forth in bullet points on pages 18 through 21 of Rolnick's brief, relate to analysis of whether there is general personal jurisdiction. Rolnick purposefully minimizes his involvement as it relates to the specific transaction at the heart of this lawsuit. Again, Rolnick was corporate counsel to plaintiff, SMLI, a business operating exclusively within the State of Texas. The transaction at issue here involved a sale of assets located in Texas and included lengthy negotiations related to SMLI's business in the State of Texas. Rolnick contacted, directly communicated and collaborated with the other defendants, who were at all relevant times, located in Travis County, Texas.

agent may be sufficient to confer jurisdiction upon the principal." *Id*. (internal citation omitted); *see also Greenfield Energy, Inc. v. Duprey,* 252 S.W.3d 721 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Notwithstanding the presence of actual or apparent authority, an agent's actions "may be attributed to the principal, for purposes of personal jurisdiction, if the principal later ratifies the agent's conduct." *Greenfield Energy, Inc*., 252 S.W.3d at 733. Ratification occurs "when a principal supports, accepts or follows through on the efforts of a purported agent." *Id*.

Here, the principal (Rolnick) worked with his agents (RAR and BCBV) to perform work on behalf of Plaintiffs. It is clear that there was actual authority for RAR and BCBV to perform work on behalf of Plaintiffs. Rolnick's role as lead counsel clearly set forth shared responsibilities (that converged at many points).

Rolnick's agency relationship is further demonstrated by the record in several fundamental ways: 1) BCBV's legal work was billed on RAR's timesheet (i.e. there was one timesheet for RAR and BCBV); CR:553 at 33:21-25; 2) it was Rolnick, not Lantz, who agreed to share in the work load on behalf of plaintiffs and Ray testified he was retained by Rolnick to perform legal services. CR:556 at 44:9-25, CR:561 at 65:1-11, CR:562 at 68:14-15; and 3). Lantz had no contact with any attorney at BCBV or RAR regarding the substantive work or reviews related to the AOS transactions. CR:387 at 31:16-19. Lantz testified he had no knowledge of BCBV's

36

involvement. *Id.* This fact demonstrates that BCBV (who was in fact involved in the case) was the **agent of Rolnick**, not Lantz.

Rolnick testified that he narrowly assigned specific responsibilities to Ray (i.e. to ensure that plaintiffs would have enforceable rights in the event of foreclosure). CR:516. Rolnick testified that he accepted and/or ratified Ray's suggestions "pretty much without question." CR:516 at 61:10-13.

For these reasons, it is proper to attribute the agent's actions (RAR and BCBV) to the principal (Rolnick) for purposes of deciding whether personal jurisdiction is appropriate. It is beyond dispute that the agents are Texas law firms that performed the work within Texas concerning a Texas legal issue. Personal jurisdiction is proper and Rolnick's motion should be denied.

Rolnick failed to address the agency issue in his brief. This failure precludes Rolnick from obtaining the relief he now seeks. *BMC Software Belgium, N.V.,* 83 S.W.3d at 793 (Tex. 2002) (noting that at the special appearance hearing, the nonresident challenging the court's assertion of personal jurisdiction must negate *all* jurisdictional bases); *Tempest,* 150 S.W.3d at 867; *Kawasaki Steel Corp.,* 699 S.W.2d at 203.

## VIII.  Conclusion and Prayer

For all of the reasons above, the trial court properly overruled Rolnick's special appearance.  Plaintiffs and Appellees SMLI and Lantz respectfully pray the Court affirm the trial court's order.

Respectfully submitted,

By:  /s/ J. Hampton Skelton

J. Hampton Skelton
State Bar No. 18457700
Brandon Gleason
State Bar No. 24028679
SKELTON & WOODY
248 Addie Roy Road, Suite B-302
Austin, Texas 78746
Telephone: (512) 651-7000
Facsimile: (512) 651-7001


Craig S. Hilliard
chilliard@stark-stark.com
STARK & STARK
A Professional Corporation
P.O. Box 5315
Princeton, New Jersey 08543-2315
Telephone: (609) 896-9060
Facsimile: (609) 895-7395

# CERTIFICATE OF COMPLIANCE

1. I certify that this brief complies with the type-volume limitation of Texas Rule of Appellate Procedure 9.4(i)(2)(B) because the word court reported by Microsoft Word states that this brief contains 7,725 words, excluding the parts of the brief exempted by Texas Rule of Appellate Procedure 9.4(i)(1).

2. This brief complies with the typeface requirements of Texas Rule of Appellate Procedure 9.4(e) because it uses Times New Roman 14-point font for the text of the body and Times New Roman 12-point font in the text of the footnotes.

/s/ J. Hampton Skelton
J. Hampton Skelton

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2015, a true and correct copy of the foregoing document was electronically filed using a certified Electronic Filing Service Provider, which will send electronic notification of such filing to counsel of record, and via email to:

Ruth G. Malinas
Tim T. Griesenbeck, Jr.
Scott M. Noel
Plunkett & Griesenbeck, Inc.
1635 N.E. Loop 410, Suite 900
San Antonio, Texas 78209

Scott R. Kidd
Scott V. Kidd
Kidd Law Firm
819 W. 11th Street
Austin, TX 78701

Michael B. Johnson
Salvador Davila
Thompson, Coe, Cousins & Irons, LLP
701 Brazos, Suite 1500
Austin, TX 78701

Robert E. Valdez
Jose "JJ" Trevino, Jr.
Joseph E. Cuellar
Valdez, Jackson & Trevino, PC
1826 North Loop 1604 West, Suite 275
San Antonio, TX 78248

/s/ J. Hampton Skelton
J. Hampton Skelton